Argued and submitted July 15, 1981, affirmed in part; reversed in part August 25, 1982, reconsideration denied February 17, petition for review denied March 29, 1983 (294 Or 682)

SCHOOL DISTRICT NO. 1,
MULTNOMAH COUNTY,
*Respondent - Cross-Respondent,*

*v.*

MISSION INSURANCE COMPANY et al,
*Respondents - Cross-Appellants, and Cross-Respondents,*
NORTHWESTERN PACIFIC INDEMNITY COMPANY,
*Appellant - Cross-Respondent.*

(No. A7707-09610, CA 15221) (Control)

SCHOOL DISTRICT NO. 1,
MULTNOMAH COUNTY,
*Respondent - Cross-Respondent,*

*v.*

NORTHWESTERN PACIFIC INDEMNITY COMPANY,
*Appellant - Cross-Respondent,*
THE INSURANCE COMPANY OF THE
STATE OF PENNSYLVANIA et al,
*Respondents -Cross-Appellants, and Cross-Respondents.*

(No. A7707-09611, CA 15222)

(Cases consolidated)

650 P2d 929

Katherine H. O'Neil, Portland, argued the cause for appellant - cross-respondent. With her on the briefs were Kenneth E. Roberts, and Schwabe, Williamson, Wyatt, Moore & Roberts, Portland.

Mark C. McClanahan, Portland, argued the cause for respondent - cross-respondent. With him on the briefs were John R. Bakkensen, Michael E. Arthur, and Miller, Nash, Yerke, Wiener & Hager, Portland.

Arden E. Shenker, Portland, argued the cause for respondent - cross-appellant - cross-respondent, The Insurance Company of the State of Pennsylvania. With him on the briefs were Elizabeth A. Trainor, Lamar Tooze, Jr., and Tooze, Kerr, Marshall & Shenker, Portland.

James M. Callahan, Portland, argued the cause for respondent - cross appellant - cross-respondent Stonewall Insurance Company. With him on the briefs was Landis, Aebi & Bailey, Portland.

Scott F. Gilman, Portland, attorney for respondent - cross-appellant - cross-respondent Mission Insurance Company, joined in the brief of appellant - cross-respondent.

Before Gillette, Presiding Judge, and Warden,* Judge, and Young, Judges.

YOUNG, J.

---

* Warden, J., *vice* Roberts, J.

## YOUNG, J.

Defendant Northwestern Pacific Indemnity (Northwestern) appeals from the judgment of the trial court finding it obligated as primary carrier by its policy of comprehensive general liability insurance to defend School District No. 1 (district) on discrimination claims filed against the district and to indemnify the district for the amounts the district had agreed to pay in settlement of certain of those claims. Northwestern also contends that the trial court erred in holding that it was required to defend the district in a counterclaim brought by the Teachers' Retirement Fund Association (TRFA) and in awarding attorney fees and prejudgment interest. The Insurance Company of the State of Pennsylvania (ICSP) and Stonewall Insurance Company (Stonewall), the district's excess carriers, cross-appeal from that portion of the trial court's order holding them alternatively liable for defense and settlement costs and jointly and severally liable with the primary carriers for costs and attorney fees. The Mission Insurance Company (Mission), successor to Northwestern as the district's primary carrier, is no longer involved in this appeal. We affirm in part and reverse in part.

Northwestern insured the district under a primary comprehensive liability policy from July 1, 1970, to August 1, 1973.[1] That policy contained a provision that

"The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay on account of any claim for breach of duty made against the insured by reason of any negligent act, error or omission of the insured * * * and the company shall have the right and duty to defend any suit against [the insured] seeking damages on account of such breach of duty even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient * * *."

This provision is referred to as "errors and omissions" coverage. Mission provided similar coverage from August 1, 1973, to July 1, 1974. The excess carriers, ICSP and Stonewall, provided coverage from July 1, 1970, to July 1, 1972, and from July 1, 1972 to July 1, 1975, respectively.

---

[1] The pre-trial order worked out in the trial court has greatly facilitated review of this complex case.

Beginning in July, 1970, a number of complaints alleging employment discrimination within the periods covered by defendants' policies were filed against the district. The complaints were initially filed with the Bureau of Labor (BOL), which investigated the complaints on behalf of the state, *see* ORS ch 659, or with the Equal Employment Opportunity Commission (EEOC), which investigated discrimination claims under federal law, *see* 42 USC § 2000 *et seq* (Title VII), or with both. A few of the complaints resulted in actions being filed in state or federal court.[2]

With one exception, defendants refused to accept the defense of and liability for any of the claims. The district undertook its own defense and in some cases reached monetary settlements with the claimants.

The trial court ruled that under the errors and omissions coverage of their policies Northwestern and Mission were obligated to pay the amounts the district had incurred in settlement of the discrimination claims to the extent that the conduct or condition complained of was committed or had occurred during the policy period of each, up to the policy limits. This is characterized as the duty to pay. The sums were allocated between Northwestern and Mission after a separate trial on damages.

The trial court also determined that Northwestern and Mission had a duty to defend the district as to each discrimination claim from the point in time when there was

"a)   an action, suit or claim filed in Court or

"b)   an administrative finding or determination (by the Oregon Bureau of Labor or the Equal Employment Opportunity Commission) of substantial evidence to support the complaint or charge."

The primary carriers (Northwestern and Mission) were held jointly and severally liable for defense costs incurred by the district in defending the discrimination claims.

In addition, in 1972, the district brought a declaratory judgment action against TRFA seeking a determination of the legal status of the unassigned surplus of the

---

[2] Some of these court actions also involved claimed violations of the Equal Pay Act of 1963, 29 USC 206(d), and the Civil Rights Act of 1864. 42 USC §§ 1981 and 1983.

fund subsequent to the pending merger of the TRFA with the Public Employment Retirement System. TRFA counterclaimed for the district's alleged wrongful failure to approve a variable annuity account as allowed by the legislature in 1969. *See* former ORS 239.210(1). In the proceedings that followed the trial court declined to rule on the counterclaim. After appeal to this court on the district's claim, *School Dist. No. 1 v. Teachers' Retirement,* 30 Or App 747, 567 P2d 1080 (1977), the case was remanded, and the parties reached a settlement. The district paid no money to TRFA as a result of that settlement.

Northwestern, ICSP and Stonewall were notified of the counterclaim against the district and declined defense of the action. The trial court in the instant proceeding determined that Northwestern's policy required that it defend the counterclaim and held Northwestern liable for the defense costs incurred by the district.

The court further determined that each excess carrier had a duty to pay the discrimination claims arising from actions taken during its policy period to the extent that the sums exceeded the amounts recoverable under the policies of the primary carriers. In addition, the court held that, if there was no coverage under the policies of the primary carriers, the excess carriers had both a duty to defend and a duty to pay the claims for discrimination occurring during their respective periods of coverage. The court also held the primary carriers liable to Stonewall for defense costs it had incurred in the defense of one of the discrimination claims. It awarded prejudgment interest to the district and held all defendants liable for costs and attorney fees pursuant to ORS 743.114.

## DISCRIMINATION CLAIMS

*1. Errors and Omissions Coverage*

■ The duty to defend an insured under an insurance policy is broader than the duty to pay. The duty to defend arises whenever there is a possibility that the policy provides coverage for the claim made. The rule for determining whether there is a duty to defend was formulated in *Ferguson v. Birmingham Fire Ins.,* 254 Or 496, 507, 460 P2d 342 (1969):

"* * * If the complaint, without amendment, may impose liability for conduct covered by the policy, the insurer is put on notice of the possibility of liability and it has a duty to defend. For example, in an action of trespass brought against the insured, if the complaint alleges a willful entry (in order to support a claim for punitive damages), the plaintiff could, without amending the complaint, recover ordinary damages for a non-willful entry. The insurer, therefore, would have the duty to defend. The innocent trespass may be treated as a 'lesser included offense' by analogy to the criminal law."

*See Ross Island Sand & Gravel Co. v. General Ins. Co. of Amer.,* 472 F2d 750 (9th Cir 1973) (applying Oregon law); *Casey v. N. W. Security Ins. Co.,* 260 Or 485, 491 P2d 208 (1971); 7C Appleman, *Insurance Law and Practice* §4682 *et seq* (1979).

■ ■ Any doubts regarding coverage are resolved in favor of the insured. *Continental Casualty Company v. Reinhardt,* 247 F Supp 173 (D Or 1965), *aff'd,* 358 F2d 306 (9th Cir 1966). However, an insurer is not required to defend claims which, if proved, would provide no basis for recovery under the policy. 7C Appleman, *Insurance Law and Practice* § 4684.01 (1979). The rules for interpreting insurance contracts are well established. The primary objective is to give effect to the intent of the parties. *Denton v. International Health & Life,* 270 Or 444, 528 P2d 546 (1974); *Ramco, Inc. v. Pacific Ins.,* 249 Or 666, 439 P2d 1002 (1968). If the language is susceptible of more than one construction, the policy is construed most favorably to the insured. *Wallace Co. v. State Auto. Ins. Co.,* 220 Or 520, 349 P2d 789 (1960); *Rainey v. Northwest. Nat. Casualty Co.,* 44 Or App 43, 605 P2d 294 (1980).

Northwestern contends that the errors and omission provision in its policy

"* * * is designed to provide coverage exclusively for those types of legal obligations which arise solely by virtue of a special risk inherent [in] and peculiar to the practice of the insured's profession."

It likens errors and omissions coverage to professional liability insurance and points out that there is nothing in a claim of employment discrimination that involves a risk inherent in or peculiar to the operation of a school district.

Although errors and omissions coverage is considered a type of professional liability insurance, *see* 7A Appleman, *Insurance Law and Practice* § 4504.01, at 310 (1979), the cases upon which Northwestern relies involved policies which contained narrowing language not found in the policy issued by Northwestern. *See, e.g., Grieb v. Citizens Casualty Company of New York,* 33 Wis 2d 552, 148 NW2d 103 (1967) (coverage for errors and omissions "in rendering or failing to render professional architectural services"); *Strauss v. New Amsterdam Casualty Company,* 30 Misc 2d 345, 216 NYS2d 861, 862 (1961) (coverage for claims "arising out of the performance of professional services for others in the insured's capacity as a lawyer"); *Smith v. Travelers Indemnity Company,* 343 F Supp 605, 608 (MDNC 1972) (coverage for damages "arising out of the performance of professional services for others in the insured's capacity as a lawyer").

Although there was testimony by a claims representative of Northwestern and an underwriter for Mission that errors and omissions coverage generally is intended to cover risks inherent in the insured's profession, there was no evidence that that narrow meaning was intended or understood by the district. The language of the policy itself does not convey that restricted meaning.

The district contends that the terms should be given their plain, ordinary meanings. Even so, such terms may be considered "ambiguous in a legal sense in that they are general terms which could intended to have been used in a more or less narrow or broad sense, depending upon the intention of the parties." *Chalmers v. Oregon Auto Ins. Co.,* 262 Or 504, 509, 500 P2d 258 (1972); *Shadbolt v. Farmers Insur. Exch.,* 275 Or 407, 411, 551 P2d 478 (1976). We, therefore, interpret the terms "in the sense in which the insured had reason to suppose [they were] understood." *Chalmers v. Oregon Auto Ins. Co., supra,* at 509; *Shadbolt v. Farmers Insur. Exch., supra.*

Negligence is a want of due care; it is not intentional injury-causing conduct. Error is defined as "an act involving an unintentional deviation from truth or accuracy; a mistake in perception, reasoning, recollection, or expression; * * * an act that through ignorance,

deficiency, or accident departs from or fails to achieve what should be done." *Webster's Third International Dictionary* (1976). An omission is a lack of action, something neglected or left undone. *Id.* The policy specifically excludes "any dishonest, fraudulent, criminal or malicious act * * *."

Northwestern argues that it is against public policy to insure against intentional wrongdoing of an insured, *see Nielsen v. St. Paul Companies,* 283 Or 277, 583 P2d 545 (1978); *Snyder v. Nelson/Leatherby Ins.,* 278 Or 409, 564 P2d 681 (1977); *Isenhart v. General Casualty Co.,* 233 Or 49, 377 P2d 26 (1962),[3] and that the policy should not be read to provide coverage for deliberate violations of the laws prohibiting discrimination in employment. It contends that intentional discrimination is not included in any reasonable meaning of the errors and omissions coverage.

The district does not contend that errors and omissions coverage was intended to cover intentional injury but argues that claims of employment discrimination do not require a showing of intentional injury by the employer. It relies on *Griggs v. Duke Power Co.,* 401 US 424, 91 S Ct 849, 28 L Ed 2d 158 (1971), for the proposition that

"* * * good intent or absence of discriminatory intent does not redeem employment procedures or testing mechanisms that operate as 'built-in headwinds' for minority groups and are unrelated to measuring job capability.

"* * * Congress directed the thrust of the Act to the *consequences* of employment practices, not simply the motivation." (Emphasis in original). 401 US at 432.

---

[3] The public policy against insuring intentional wrongdoing of an insured was explained in *Nielsen v. St. Paul Companies, supra,* 283 Or at 281:

"* * * It is not sufficient that the insured's intentional, albeit unlawful, acts have resulted in unintended harm; the acts must have been committed for the purpose of inflicting the injury and harm before either a policy provision excluding intentional harm applies or the public policy against insurability attaches. *Snyder v. Nelson/Leatherby Ins.,* 278 Or 409, 413-14, 564 P2d 681 (1977); *City of Burns v. Northwestern Mutual,* 248 Or 364, 369, 434 P2d 465 (1967)."

The court went on to note that "[t]here are some intentional acts the nature of which is such that it must necessarily be concluded that there was an intention to injure." But, the court stated, "[m]ere unlawfulness of the act does not raise any necessary implication that it was the actor's intention to injure." 283 Or at 281. *See also A-1 Sandblasting v. Baiden,* 293 Or 17, 643 P2d 1260 (1982).

However, the Supreme Court pointed out in *Teamsters v. United States,* 431 US 324, 335-36 n 15, 97 S Ct 1843, 52 L Ed 2d 396 (1977), that there are two theories of discrimination under Title VII:

> " 'Disparate treatment' * * * is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin. Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment. * * *
>
> "Claims of disparate treatment may be distinguished from claims that stress 'disparate impact.' The latter involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity. * * * Proof of discriminatory motive, we have held, is not required under a disparate impact theory.* * *"

*See also Furnco Construction Corp. v. Waters,* 438 US 567, 98 S Ct 2943, 57 L Ed 2d 957 (1978).

■ Although there do not appear to be any Oregon cases discussing this distinction between disparate treatment and disparate impact, and we have found no explicit disparate impact cases, we believe the Oregon statute is susceptible to that interpretation. Resolving any doubts in favor of the insured, we conclude that a claimant could state a cause of action under Oregon law for discrimination based on disparate impact. *See School District No. 1 v. Nilsen,* 271 Or 461, 477, 495, 534 P2d 1135 (1975); *see also Hess v. Employment Div.,* 29 Or App 229, 562 P2d 1232 (1977).

In *Solo Cup Co. v. Federal Ins. Co.,* 619 F2d 1178 (7th Cir), *cert den* 449 US 1033 (1980), a case also involving the duty to defend discrimination claims, the court determined that the insurance policy at issue in that case did not provide coverage for intentional discrimination because the policy definition of a covered "occurrence" extended only to unintentionally exposing complainants to discriminatory conditions. It did conclude, however, that there was potential coverage for claims alleging discrimination by disparate impact that do not require proof of discriminatory motive.

■　　　Although the policy provisions at issue here are different, we reach a conclusion similar to that reached by the court in *Solo Cup.* Northwestern's policy provides coverage for claims of breach of duty "by reason of any negligent act, error or omission of the insured." We do not believe that any reasonable reading of those terms could result in coverage for intentional discrimination. Discrimination by disparate treatment means treating an individual less favorably *because* of that individual's race, sex, color, religion, or national origin. It is the injury which must be intended.[4] Claims of disparate treatment are not covered.

However, claims of discrimination based on disparate impact, which do not require a showing of discriminatory intent, could encompass actions, judgments or decisions that might be considered negligent acts, errors or omissions under the policy. Discrimination claims containing allegations that *could be* interpreted as disparate impact claims, that is, that would allow the complainant to prove discrimination by disparate impact, are potentially within the coverage of the policy, and Northwestern had a duty to defend such claims if other policy requirements were met.

It might well be that a complaint could be construed as claiming either or both types of unlawful discrimination.

> "* * * In case of doubt, as to whether or not the allegations of a complaint against an insured state a cause of action within the coverage of a liability policy sufficient to compel the insurer to defend the action, such doubt will always be resolved in favor of the insured." *Continental Casualty Company v. Reinhardt, supra,* 247 F Supp at 174.

Although allegations in a discrimination complaint are broadly construed, *Sanchez v. Standard Brands, Inc.,* 431 F2d 455, 465-66, (5th Cir 1970), every charge is not all-encompassing. The complaint filed in a civil action on the basis of a complaint to the EEOC

> "* * * is confined to those issues the original complaint has standing to raise, but may properly encompass any

---

[4] Because we decide that intentional discrimination is not covered by Northwestern's policy, we need not decide whether intentional discrimination would be uninsurable as a matter of policy.

such discrimination like or reasonably related to the allegations of the charge and growing out of such allegations during the pendency of the case before the commission." *King v. Georgia Power Company,* 295 F Supp 943, 946-47 (ND Ga 1968).

The same limitations were applied to the complaint in *School District No. 1 v. Nilsen, supra,* under the Oregon Fair Employment Practices Act.

We now turn to an examination of each of the discrimination claims filed against the district for which Northwestern was held to be liable.

*2. Individual Claims of Discrimination*

The first claim is referred to by the parties as the "Sally Flury" claim, because it was initiated by a complaint filed with the BOL by one of the district's probationary teachers, Sally Flury. The dispute culminated in *School District No. 1 v. Nilsen, supra.* Flury complained that she had been discriminated against on the basis of sex, because the district's policy regarding probationary teachers required her to resign when she became pregnant, and that the district refused to grant her maternity leave, although the district allows tenured teachers to take up to one school year of maternity leave.

The BOL found substantial evidence to support the charge of sex discrimination. After conciliation failed, the Attorney General, pursuant to ORS 659.060,[5] filed "Specific Charges of Discrimination," charging that the district's policy regarding pregnant probationary teachers constituted sex discrimination. The Commissioner found that the district had unlawfully discriminated. The Supreme Court found that the application of certain portions of the district's policy constituted unlawful sex discrimination but that other requirements under the policy were based on a bona fide occupational requirement.

Although this claim could be interpreted as a claim of disparate treatment, it is also possibly, and in fact probably, a claim of disparate impact. The failure of the

---

[5] ORS 659.060 provides that if conciliation fails the "commission" shall cause charges to be prepared. Apparently the Attorney General actually prepares the charges.

district to recognize the discriminatory impact of its policy regarding pregnant probationary teachers and to continue to apply that policy to Sally Flury and others similarly situated could be considered an error or a negligent act. A showing of intent was not required. *See School District No. 1 v. Nilsen, supra,* 271 Or at 477, 495.

Northwestern also contends that it did not have a duty to defend these discrimination claims until there was a "suit * * * seeking damages" and that "suit" means a proceeding in a court. The trial court found the primary carriers liable for defense costs incurred from the time of a finding of substantial evidence to support the charge by the BOL or the EEOC.

As noted above, the primary consideration in interpreting insurance policies is to determine the intent of the parties, resolving ambiguities in favor of the insured. "Suit" is not defined in the policy. It can have several meanings. *Webster's New International Dictionary* (1976) defines "suit," in pertinent part, as "the attempt to gain an end by legal process; prosecution of right before any tribunal," and more narrowly as "an action or process in a court for the recovery of a right or claim: a legal application to a court for justice."

The policy provides that the insurer will "pay on behalf of the insured all sums which the insured shall become legally obligated to pay" on account of certain types of claims. The Commissioner of the BOL was authorized to enter an order requiring the district to compensate victims of discrimination for the pecuniary losses they suffered. *See* ORS 659.060; 659.010(2); *Fred Meyer v. Bureau of Labor,* 39 Or App 253, 592 P2d 564, *rev den* 287 Or 129 (1979); *Williams v. Joyce,* 4 Or App 482, 479 P2d 513, *rev den* (1971).[6]

We believe that the term "suits" as used in Northwestern's policy is sufficiently broad to cover administrative proceedings before the BOL and the EEOC. *See*

---

[6] In addition, it makes particular sense for the insurer to defend before the BOL, because the parties only get to court on appeal from what has occurred before the agency. ORS 659.085; *see School District No. 1 v. Nilsen, supra; Fred Meyer v. Bureau of Labor, supra; Brady v. Bureau of Labor,* 55 Or App 619, 639 P2d 673 (1982); *Lewis and Clark College v. Bureau of Labor,* 43 Or App 245, 602 P2d 1161 (1979), *rev den* 288 Or 667 (1980).

*Safeway Moving & Storage Corp. v. Aetna Insurance Co.,* 317 F Supp 238 (ED VA 1970), *modified* 452 F2d 79 (4th Cir 1971); *see also Solo Cup Co. v. Federal Ins. Co., supra,* 619 F2d at 1188 n 7. The trial court determined that the duty to defend arose at the time of a finding of substantial evidence to support the charge by the BOL or the EEOC. That particular beginning point is not challenged by any party here. In the Sally Flury matter the defense costs Northwestern was ordered to pay were all incurred after a finding of substantial evidence to support the charge.

There is some authority that an insurer has no duty to defend a claim against an insured which seeks only injunctive relief. *See* 14 Couch on Insurance 2d § 51:33 (1965); *Annot.,* 53 ALR 2d 1132 (1957); *Ladd Const. Co. v. Ins. Co. of North America,* 73 Ill App 3d 43, 391 NE2d 568 (1979). While the original complaint filed with the BOL by Flury did not specifically ask for money damages, a reasonable reading of the complaint indicates that Flury sought to prevent the district from continuing to carry out its policy regarding pregnant probationary teachers, and also sought to recover the damages she sustained by the application of that policy to her. Her complaint stated that because of the discrimination of the district she would lose medical benefits, sick leave, seniority and other benefits. The allegations of the complaint could support an award of damages.[7]

We conclude that the trial court's determination that Northwestern had a duty to defend the Sally Flury case was correct.

Northwestern was also held liable for defense of the claim of Virgie Harris. The Harris complaint alleged both race and sex discrimination. The BOL found substantial evidence to support the claim of sex discrimination but not of discrimination based on race. The allegation of sex discrimination was also based on the district's policy regarding pregnant probationary teachers. We conclude that Northwestern had a duty to defend that claim for the same reasons that it had a duty to defend the Sally Flury claim.

---

[7] The BOL in fact awarded monetary damages for humiliation, but that award was reversed by the Supreme Court for lack of evidence to support it. *School District No. 1 v. Nilsen, supra,* 271 Or at 484-86.

The Harris claim resulted in a settlement between the district and the complainant by which the district paid $3,150. The settlement agreement specifically stated that the district made no admission of liability and specifically disputes the legal basis underlying the claim. The duty to defend is, as noted above, broader than the coverage of the policy. Although the Harris claim presented a possibility of coverage raising the duty to defend, it might also have been shown that the discrimination complained of was in fact intentional and not the result of any act covered by the policy.

It appears that the question whether an insurer who has wrongfully refused to defend may later attempt to show that the insured's actions were not within the coverage of the policy has not been addressed in this state, *see* *Snyder v. Nelson/Leatherby Ins. Co., supra,* 278 Or at 412 n 12;[8] however, we are not now called upon to address that issue. Northwestern made no effort in the trial court to show that this settlement or any of the others reached by the district, was based on intentional discrimination by the district. Therefore, there is no basis in this record to determine that settlements made on claims that potentially involved actions covered by the policy actually were based on intentional unlawful discrimination. The trial court correctly held that Northwestern is liable for the costs of the defense and of the settlement in the Harris case.

We next look at what the parties and the trial court have referred to as the Judith Dean case. This involved an initial complaint of discrimination filed with the BOL and the EEOC by 11 district employes who, along with other duties, coached girls' track. These 11 filed identical allegations of discrimination, charging that boys' track coaches were paid more than girls' track coaches and had better working conditions. After receiving a "right to sue" letter from the EEOC, the coaches filed suit in federal District Court, seeking an injunction and damages under Title VII and the Equal Pay Act of 1963, 29 USC § 206(d). The action resulted in a judgment in favor of the district,

---

[8] There is authority that the insurer is estopped to deny coverage after wrongfully refusing to defend. *See* 14 *Couch on Insurance 2nd* § 51:54.

the trial court concluding that the job of a girls' track coach was not substantially equal to that of a boys' track coach.[9]

Although it would be possible to show that the district intentionally discriminated against the girls' track coaches under those allegations, *County of Washington v. Gunther*, 452 US 161, 101 S Ct 2242, 68 L Ed 2d 751 (1981), a showing of intentional discrimination on the basis of sex is not necessary to the establishment of a violation. The complaints alleged that teachers who also coached girls' track received less than teachers who coached boys' track. Girls' track coaches are not necessarily women and, in fact, one of the plaintiffs in the suit was a male teacher.

■　　We conclude that Northwestern had a duty to defend the Judith Dean case, because the complaints could be construed to allege discriminatory disparate impact. The defense costs claimed by the district as a result of the Judith Dean case included only those costs incurred after the filing of the action in federal court. There is no question, then, of whether defense costs incurred in defending the case before administrative agencies are recoverable. The district court complaint specifically sought damages as well as an injunction. The trial court was correct in its determination that Northwestern had a duty to defend the district in the Judith Dean case.

Northwestern was also held liable for defense and settlement costs incurred by the district as a result of a complaint filed with the BOL and the EEOC by Marguerite (Norton) Ledbetter. Ledbetter alleged that she was employed by the district in 1955 to replace a male who had

---

[9] The trial court concluded, after finding that the jobs were not substantially equal:

> "Thus I need not decide whether the sex of either the athletes coached or the coaches themselves influenced the District's decision to pay coaches of the girls' track teams a lower salary. Nothing in Title VII or the Equal Pay Act authorizes me to redress what may be an excessive discrepancy in wages paid by an employer for merely comparable (though not substantially equal) work or jobs."

The Supreme Court has, however, recently held that the failure to give equal pay for equal work is not the only possible claim of discrimination in wage rates under Title VII, but that it could also be shown that even without a substantially equal job performed by a male for comparison, the employer intentionally paid females less because of their sex. *County of Washington v. Gunther, supra.*

been designated as a carpenter. His duties consisted of making and repairing window shades. When she was hired, she performed the same duties as her predecessor but was designated a "window shade maker" and received a substantially lower wage than her predecessor and other male carpenters employed by the district who performed substantially equal work. The EEOC found substantial evidence of discrimination. Conciliation through the EEOC resulted in a settlement between the complainant and the district.

■      We do not believe that this can be interpreted as a claim of disparate impact. The claimant alleged that she was paid less than the male employe she replaced and less than the male carpenters with whom she worked, even though she performed the same job duties. That is not a claim that a facially neutral policy or practice resulted in women receiving lower pay. It is a claim that she received less than her co-workers and her predecessor *because* she was a woman. In order to prevail in a trial the complainant was required to show that the district paid her less *because* she is a woman. In this type of case the complainant must first make out a prima facie case of discrimination. The burden then shifts to the employer to show that there was a legitimate non-discriminatory reason for its actions. The complainant may then produce evidence that the reason given by the employer was merely a pretext for unlawful discrimination. *McDonnell Douglas Corp. v. Green,* 411 US 792, 93 S Ct 1817, 36 L Ed 2d 668 (1973); *Furnco Construction Corp. v. Waters, supra; see School District No. 1 v. Nilsen, supra; Clackamas Co. Fire Protection v. Bureau of Labor,* 50 Or App 337, 624 P2d 141, *rev den* 291 Or 9 (1981). However,

> "[T]he central focus of the inquiry in a case such as this is always whether the employer is treating 'some people less favorably than others because of their race, color, religion, sex, or national origin.' Teamsters v. United States, supra, at 355 n 15, 52 L Ed 2d 396, 97 S Ct 1843." *Furnco Construction Corp v. Waters, supra,* 438 US at 577.

The trial court erred in holding Northwestern liable for defense of the Ledbetter claim and for the settlement amount paid.

■ Teacher Julius Speiginer alleged race discrimination, involving harassment, job classification and discharge, in complaints to the BOL and EEOC and in a lawsuit in federal district court. The administrative claims were concluded by a settlement between Speiginer and the district in which the district paid Speiginer an amount of money. The lawsuit was still pending at the time of the trial of this case. The trial court held Northwestern partially liable for the settlement amount and for defense costs incurred and to be incurred in the lawsuit. The district did not claim defense costs for the administrative proceedings.

Speiginer's complaint filed with the BOL states:

"I have been employed with the School District for five years. During that period, I have been harassed concerning my work and methods of teaching, etc. I believe this has occurred due to the fact that I am black."

The complaints filed with the EEOC are not in the record here. There is a "Notice of Charge of Employment Discrimination" that pre-dates the settlement agreement. It indicates that a charge of race discrimination was made, and there are checks in boxes specifying the nature of the charge as "terms and conditions" and "intimidation/reprisal."

Claims of harassment because of race must be claims of disparate treatment. Harassment is not a facially neutral policy or practice which has merely a discriminatory impact, but a claim which, if the complainant is to prevail, requires a showing of intent. There is no basis for liability because of a negligent act, error or omission. The amount of the settlement between Speiginer and the district is not within Northwestern's errors and omissions policy coverage.

The Speiginer complaint in federal district court alleges, in pertinent part, that Speiginer was employed by the district as a teacher and satisfactorily performed the duties of that position but that, notwithstanding such satisfactory performance, the district "initiated and maintained a pattern and practice of harassment, humiliation, and ridicule against him, all on account of his race and color."

It further alleged that he was forced to enter into an agreement to work as a warehouseman,[10]

> "all on account of his race and color, and in retaliation against him by [the district] for his objection to and protest of the unlawful employment practices against him complained of herein."

Again, this is a claim of intentional harassment and retaliation. Northwestern has no duty to defend this type of action under the terms of its policy.

■ We next turn to the complaints of three security guards employed by the district at the Portland Residential Manpower Center, Vivian Mathis, Lois Gates and Nina Kelly. Each of these women filed two complaints with the BOL, the first claiming sex and race discrimination and the second harassment because of the first complaint. The BOL found substantial evidence to support the claims. Apparently no damages were paid by the district, but Northwestern was held liable for defense costs.[11] The three have been considered together during the processing at the BOL and throughout the proceedings in the trial court in this case. We, therefore, consider them together.

Two of the initial complaints state only that the complainants had been discriminated against on the basis of race and sex in salary and promotions. The third, however, states:

> "Working as a security officer with four other officers, doing the same job but different hours, but I receive less pay and my days off have been changed three times within the past ten months without notification ahead of time to me. I feel I have been discriminated against because of my race and sex."

The allegations regarding pay and days off, although they could include a claim of disparate treatment, would also allow proof of a facially neutral practice or policy of the

---

[10] This apparently refers to the settlement agreement in which Speiginer agreed to perform whatever duties the district required during the one year period in which he was being paid.

[11] There was an indication in a question asked of counsel for the district that a settlement had been paid to these claimants. There was an objection that the question was leading, and that objection was sustained. The record contains no evidence that a settlement was reached and paid by the district, and none of defendants was required to pay any settlement that may have been made.

district resulting in unintentional discrimination. Because that possibility exists, the claims are within the errors and omissions coverage, and the trial court correctly held Northwestern liable for defense costs.

The last group of discrimination claims for which Northwestern was held liable involves four complaints filed with the BOL. The four are not related except by the fact that there was apparently no action taken on any of them after the filing of the complaints. The trial court held that Northwestern had a duty to defend those claims if and when they become "suits" as that term was interpreted by the trial court, that is, on the date on which substantial evidence of discrimination is found or the date on which a suit is filed in a court.

█ The first complaint filed by Linda Vladimiroff alleged that she was harassed because of her association with a black man and with another individual who had filed a discrimination complaint. We conclude that this is a claim of disparate treatment and is not, as it is now phrased, within the coverage of the Northwestern policy.

█ The second complaint was filed by Stanley Martin and stated: "Were told I could not go to school because I would not sign a pleage [pledge?] that was against my religion." Although it is difficult to discern the precise meaning of this claim, it appears that it could involve a practice of the district that is neutral on its face, but that has a discriminatory effect on members of a particular religion. It could involve actions within the purview of the errors and omissions coverage; if and when it evolves into a suit, Northwestern will have a duty to defend.[12]

█ The third complaint was filed by William Zangwill. It states:
"On Thursday Feb. 3, 1972 I worked at Marshall High School. I was informed by a friend of mine that the Principal had informed her that neither she, nor anyone in her department, was to request my services as a substitute teacher again.

---

[12] Although this might not appear to be an *employment* discrimination claim, it was considered to be such a claim by the BOL; and we treat it as at least potentially a claim of employment discrimination.

"After evaluating all the facts I have received, I am forced to conclude that this action was taken because of my national origin, and perhaps, my sex.

"I request the Civil Rights Division to investigate my complaint."

Again, we conclude that this claim is one of disparate treatment and not disparate impact. As it is now presented, the claim is not one which raises a duty to defend under the Northwestern policy.

The final discrimination complaint, filed by John Bryant, alleges race discrimination as follows:

"I feel that I was discriminated against due to constant harassment; I also feel that I have been de-evaluated because of supplies that was promised to me but were not given. This situation created a problem for me as a teacher and with my students. I am constantly being harassed by supervisors evaluating me as being incompetent.

"I feel that other black[s] are being treated the same way."

As we have noted, harassment is not a facially neutral practice or policy. Racial harassment requires intent and is not within the errors and omissions coverage of the Northwestern policy.

## 3. Policy Conditions

In addition to the contention that there is no coverage for discrimination claims, Northwestern argues that it is not liable for some of the claims because the district failed to comply with certain conditions specified in the policy. The first is known as an "after trial" clause. It provides:

"No action shall lie against the company unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this policy, nor until the amount of the insured's obligation to pay shall have been finally determined after actual trial or by written agreement of the insured, the claimant and the company."

An almost identical provision was in issue in *Lamb-Weston et al v. Ore. Auto. Ins. Co.*, 219 Or 110, 341 P2d 110, 346 P2d 643 (1959), in which the court held that such a provision did not bar recovery against an insurer

who denies liability and refuses to defend the insured. 219 Or at 116. The district's recovery is not barred by that provision of the policy.

■ Northwestern further contends that it did not receive timely notice of all of the claims. The policy requires:

> "If claim is made or suit is brought against the insured, the insured shall immediately forward to the company every demand, notice, summons or other process received by him or his representative."

The pre-trial order includes in its "Agreed Facts-Discrimination Claims" section statements that the district timely notified Northwestern of the Sally Flury and the Judith Dean claims. As to the other claims for which we have held that Northwestern had a duty to defend, notice was given in a letter dated July 11, 1973. The district had been informed of the claims for the first time in October, 1972. We do not decide whether this nine-month interval is a reasonable time to give notice under these circumstances, because Northwestern denied coverage of all of the claims on grounds other than failure to give notice. The rule in this state is:

> " 'A failure to give notice or furnish proofs of loss, or defects in the notice and proofs, are waived by a denial of liability on other grounds. * * *' " *Eaid v. National Casualty Co.,* 122 Or 547, 558, 259 P 902 (1927); *see Great American Ins. v. General Ins.,* 257 Or 62, 71, 475 P2d 415 (1970).

*See also Lusch v. Aetna Cas. & Surety Co.,* 272 Or 593, 538 P2d 902 (1975). Northwestern denied coverage because the claims were not within the scope of errors and omissions coverage. It did not rely on inadequate notice. Any deficiencies in the notice were waived.

Summarizing, we conclude that Northwestern had a duty to defend and, where applicable, to pay, the Sally Flury, Virgie Harris, Judith Dean, Mathis, Gates and Kelly and Stanley Martin claims. It had no duty to defend, or pay, the Ledbetter, Speiginer, Vladimiroff, Zangwill and Bryant claims.

## TRFA COUNTERCLAIM

In addition to the discrimination claims, the trial court also held that Northwestern had a duty to defend the

counterclaim filed against the district by TRFA. The counterclaim sought damages for losses allegedly incurred after the district "wrongfully refused" to approve a variable annuity account as allowed by the legislature in 1969 and as requested by TRFA in 1971. The matter was settled without payment by the district.

The counterclaim was based on former ORS 239.210(1), which provided at the relevant times:

> "Any board of trustees of an association under ORS 239.002 to 239.263 may, *with the approval of the school district,* establish a separate account to be known as the Variable Annuity Account."[13]

The theory under which TRFA expected to recover from the district for "wrongfully refusing" to approve a variable annuity account is not entirely clear.[14]

However, the viability of that claim is not at issue here. Northwestern undertook to defend claims against the district within the policy coverage "even if any of the allegations of the suit are groundless, false or fraudulent * * *." While this undertaking does not expand the coverage of the policy, it does indicate that it is not only meritorious claims that raise the insurer's duty to defend. As noted above, any doubts as to the duty to defend should be resolved in favor of the insured.

We believe that under the allegation that the district "wrongfully refused" to approve the variable annuity plan TRFA would have been allowed to produce evidence that the failure to approve was the result of a negligent act,

---

[13] This section was amended in 1973 to provide that a variable annuity account could be established with 30 days' notice to the school district, deleting the requirement that approval be obtained.

[14] The actions of a school district are subject only to limited review by the courts:

> "* * * Courts can interfere only when the board refuses to exercise its authority or pursues some unauthorized course. * * * The wisdom or expediency of an act, or the motive with which it was done, is not·open to judicial inquiry or consideration where power to do it existed. * * *." *School District No. 17 v. Powell,* 203 Or 168, 191, 279 P2d 492 (1955); *see Padberg; West et al v. Martin et al,* 225 Or 135, 357 P2d 255 (1960).

Counsel for the district in the *School District v. TRFA* case testified that the district's demurrer to the counterclaim was overruled. ·No court made a ruling on the merits of the claim.

error or omission. Whether such a claim would be successful on a showing of intentional or negligent refusal is not a question we must decide. The duty to defend is based upon the determination whether, *if* successful, the claim could come within the coverage of the policy. The TRFA counterclaim could come within the errors and omissions coverage. Northwestern had a duty to defend.

## PREJUDGMENT INTEREST AND ATTORNEY FEES

Northwestern next contends that it was error to award prejudgment interest on the amounts awarded the district. Interest on unliquidated damages for breach of contract is appropriate

"* * * where (1) the exact amount of damages is either ascertained or readily ascertainable, and (2) the time from which the interest runs is easily ascertained." *Krieg v. Union Pacific Land Res. Corp.,* 269 Or 221, 234, 525 P2d 48 (1974). (Footnote omitted.)

*See Public Market Co. v. Portland,* 171 Or 522, 130 P2d 624, 138 P2d 916 (1943). The trial court ordered the interest to run from the date on which payments were made to the private counsel hired to defend the district and the dates on which the settlement payments were made by the district.

Northwestern did not contest the amounts paid by the district for the settlements or the amounts paid in defense costs. The pre-trial order contains in its "Agreed Facts & Liabilities and Duty of Defense" section the following statement:

"8. If any or of all the discrimination claims and/or TRFA counterclaims are the subject of coverage under the primary insurers' (Mission and NW Pacific) errors and omissions coverage, such insurers, respectively, are liable up to the applicable policy limits for all sums which the District (1) became or in the future becomes legally obligated to pay thereon and (2) incurred or in the future incurs as a result of the insurers' failure to assume their right and duty to defend any suit thereon arising during their policy period."

At trial the district presented evidence of the amounts paid and testimony that such amounts were reasonable. The only real issue concerning the amount of the damages was

the allocation of the damages between the two primary insurers.

■ The fact that this type of issue requires resolution does not defeat a claim for prejudgment interest. *See Isler v. Shuck,* 38 Or App 233, 239, 589 P2d 1180 (1979); *Public Market Co. v. Portland, supra; cf. Arden-Mayfair v. Patterson,* 46 Or App 849, 613 P2d 1062, *rev den* 290 Or 149 (1980) (prejudgment interest not allowed where the parties "did not agree upon the amount in dispute"). The award of prejudgment interest to the district was proper.

■ Northwestern's final assignment of error as to the district is that the award of $40,000 in attorney fees was excessive. The evidence indicated that counsel for the district put in over 1,000 hours on the case and that the district had been billed $39,200 as of July 1, 1979, before the separate hearing on the cost bill and completion of the preparation of the judgment order. The district's expert witness testified that a reasonable fee would be $50,000 to $55,000. There was ample evidence to support the award of $40,000.

Northwestern's remaining assignments of error concern the portion of the trial court's order giving defendant Stonewall judgment against the two primary carriers for the amount of defense costs incurred by Stonewall in defense of the Judith Dean case and the award of attorney fees.

When the defense of the Judith Dean case was tendered to Stonewall by the district, Stonewall agreed to defend under a reservation of rights. The district exercised primary control through its retained counsel, however, and Stonewall participated only in various legal research projects and in the preparation of trial and post-trial memoranda. The trial court entered judgment in favor of Stonewall against the primary carriers in the amount of the defense costs incurred by Stonewall in its participation in the Dean case.

The policies of both of the excess carriers, Stonewall and ICSP, differed from the policies of the primary carriers. The coverage of the excess carriers is on an "occurrence" basis. "Occurrence" is defined as:

"(a) an accident, or (b) an event, or continuous or repeated exposure to conditions, which results during the policy period, in personal injury, property damage, or advertising liability (either alone or in combination) neither expected nor intended from the standpoint of the Insured."

The policy provides that the insurer will indemnify the insured for the "ultimate net loss" incurred because of "personal injuries," defined as:

"* * * bodily injury, sickness or disease, mental anguish, shock, disability, false arrest, false imprisonment, wrongful eviction, detention, malicious prosecution, *discrimination,* humiliation, invasion of right of privacy, libel, slander or defamation of character, including death at any time resulting therefrom." (Emphasis added.)

The term "ultimate net loss" is defined as:

"* * * the total sum which the Insured, or any company as his insurer, or both, becomes legally obligated to pay as damages, because of personal injury * * * either through adjudication or compromise, and shall also include hospital, medical and funeral charges and all sums paid as salaries, wages, compensation, fees, charges and law costs, premiums on attachment or appeal bonds, interest on judgments, expenses for doctors, lawyers, nurses and investigators and other persons and for litigation, settlement, adjustment and investigation of claims and suits which are paid as a consequence of any occurrence covered hereunder, excluding only the salaries of the Named Insured's or of any underlying insurer's permanent employees."

By endorsement, the policy provided:

"As respects occurrence covered under this policy, but not covered under the underlying insurance or under any other collectible insurance, the Company, shall:

"(a) defend in his name and behalf any suit against the insured alleging liability insured under the provisions of this policy and seeking damages on account thereof; even if such suit is groundless, false or fraudulent."

Northwestern argues that Stonewall defended the Dean case because it was required to do so under its own policy and that it has no right to subrogation for the expenses incurred in that defense. We disagree. When the primary carriers refused the defense of the Dean case,

Stonewall had a duty to defend that case if there was a potential liability under its policy. We conclude that there was a possibility of coverage. "Personal injury" as defined specifically includes discrimination. As we have noted, the Dean claim did not require a showing of intentional discrimination. The claim then potentially came under the definition of an "occurrence" as "continuous or repeated exposure to conditions, which results * * * in personal injury * * * neither expected nor intended from the standpoint of the Insured."

Although some courts have held that the duty of the excess carrier to defend is personal to each insurer and that an excess carrier is not entitled to reimbursement from a primary carrier for costs of defense, *see, e.g., First Insurance Co. of Hawaii v. Continental Casualty Co.,* 466 F2d 807 (9th Cir 1972); *United States Fidelity & Guar. Co. v. Tri-State Ins. Co.,* 285 F2d 579 (10th Cir 1960); *Maryland Cas. Co. v. American Family Ins. Group,* 199 Kan 373, 429 P2d 931 (1967), many courts have held that an excess carrier is entitled to subrogation. *See Liability Assur. Corp. v. Indemnity Ins. Co.,* 228 F Supp 896 (D Md 1964); *New Amsterdam Cas. Co. v. Certain Underwriters,* 34 Ill 2d 424, 216 NE2d 665 (1966); *Fidelity General Insurance Co. v. Aetna Ins. Co.,* 27 App Div 2d 932, 278 NYS2d 787 (1967); *Standard Surety & Casualty Co. v. Metropolitan Cas. Co.,* 67 NE2d 634 (Ohio App 1945); *Aetna Casualty & Surety Co. v. Buckeye Union Cas. Co.,* 157 Ohio St 385, 105 NE2d 568 (1952); *Fireman's Fund Indem. Co. v. Freeport Insurance Co.,* 30 Ill App 2d 69, 173 NE2d 543 (1961); *see also* 7C Appleman, *Insurance Law and Practice* § 4682, 28-37 (1979), and cases cited therein.

Northwestern had a duty to defend the Dean case and refused to do so. Stonewall had a potential liability under its policy if Northwestern was correct in denying its liability. "Subrogation is a device adopted by equity to compel the ultimate discharge of an obligation by him who in good conscience ought to pay it." *Jenks Hatchery v. Elliott,* 252 Or 25, 31, 448 P2d 370 (1968). Although a "volunteer" is not entitled to subrogation, Stonewall had a legal interest of its own to protect and thus was not a volunteer. *See Hult v. Ebinger,* 222 Or 169, 352 P2d 583 (1960). Stonewall was entitled to reimbursement from

Northwestern for the expenses incurred in defending the Dean case.

■     Northwestern's final contention is that Stonewall is not entitled to an award of attorney fees under ORS 743.114, which provides:

"If settlement is not made within six months from the date proof of loss is filed with an insurer and an action is brought in any court of this state upon any policy of insurance of any kind or nature, and the plaintiff's recovery exceeds the amount of any tender made by the defendant in such action, a reasonable amount to be fixed by the court as attorney fees shall be taxed as part of the costs of the action and any appeal thereon. * * *"

Northwestern relies on *General Acc. F. & L. Assur. Corp. v. Continental Cas. Co.*, 287 F2d 464 (9th Cir 1961), construing a predecessor statute, former ORS 736.325. There the court held that

"* * * the statute was not intended to cover actions brought by one insurance company as subrogee of rights against another insurer. That section, referring as it does to the failure to make 'settlement,' appears to contemplate a controversy directly between an insured and his insurer. We doubt that the legislature was concerned with the ability of an insurance company, suing as a subrogee, to recover attorneys' fees." 287 F2d at 468-69.

Stonewall, on the other hand, relies on *Portland General Elec. Co. v. Pacific Indem. Co.*, 579 F2d 514 (9th Cir 1978), also applying Oregon law, where the court held that an excess carrier is subrogated to all of the insured's rights, including the right to attorney fees under ORS 743.114.

The Oregon Supreme Court has stated:

"The purpose of ORS 743.114 allowing recovery of attorney fees by claimants under insurance policies is to encourage the settlement of such claims without litigation and to reimburse successful plaintiffs reasonably for moneys expended for attorney fees in suits to enforce insurance contracts. * * *" *Chalmers v. Oregon Auto. Ins. Co.*, 263 Or 449, 452, 502 P2d 1378 (1972).

In *Groce v. Fidelity General Insurance*, 252 Or 296, 448 P2d 554 (1968), the court allowed the plaintiffs, who had obtained a judgment against one of the defendant's insureds

for an amount in excess of the policy limits, to recover attorney fees under ORS 743.114 · as assignees of the insured's rights under the policy. The action against the insurer was based on the wrongful failure to settle within the policy limits. The trial court had held that the actions were not "upon any policy of insurance" within the meaning of the statute. The Supreme Court held that the duty of an insurer to settle litigation within policy limits is a duty that arises out of the contract of insurance and that it would be consistent with the purpose of the statute to allow attorney fees in that case.

In *Fick v. Dairyland Insurance,* 42 Or App 777, 601 P2d 868 (1979), Dairyland refused to pay a judgment entered against its insured. The injured party was compensated by his own insurer. Dairyland's insured assigned all her rights under her policy to the injured party and his insurance company, who then brought suit against Dairyland for the amount of the judgment. In holding that the plaintiffs were entitled to an award of attorney fees under ORS 743.114, we noted:

> "* * * [T]here is nothing compelling in the words of the statute itself that limits recovery of attorney fees to the insured or injured party or that excludes insurance companies from being entitled to the benefit of the public policy." (Footnote omitted.) 42 Or App at 781; *cf. N. W. Marine Iron v. Western Casualty,* 45 Or App 269, 608 P2d 199, *rev den* 289 Or 209 (1980).

We do not see any reason for treating a subrogee of the insured's interests under the policy any differently than an assignee.[15] We hold that the award of attorney fees to Stonewall was proper.

We now turn to the cross-appeals by the excess carriers, Stonewall and ICSP. The trial court held that the excess carriers were liable for the defense and settlement costs incurred by the district in the discrimination claims if it should be determined that the primary carriers were not liable. Both excess carriers assign this holding as error.

---

[15] *Fick* suggests that an insurer acting as subrogee under ORS 743.783 would not be entitled to attorney fees under ORS 743.114. Stonewall here was not seeking recovery under ORS 743.783, but as an equitable subrogee of the rights of the insured.

We have found Northwestern liable on certain of the claims. Mission, the other primary carrier, did not appeal from the trial court's order holding it liable for certain claims, and that determination is not before us. As to the claims for which the primary carriers are liable, then, there is no issue remaining concerning the excess carriers.[16] The only claims to which this assignment is applicable are those claims for which we have held that Northwestern had no duty to defend or to pay. Those are the Ledbetter, Speiginer, Vladimiroff, Zangwill and Bryant claims.[17] We have held that those were claims of disparate treatment requiring proof of intentional discrimination. We must, therefore, consider whether the policies of the excess carriers provided or potentially provided coverage for such claims.

The pertinent provisions of the policies are set out above. As noted, "personal injury" is defined to include discrimination. However, Stonewall and ICSP argue that the discrimination alleged does not come with the policy definition of an "occurrence," because it did not "unexpectedly and unintentionally" cause the injury to the complainants.

■ Although the coverage of the primary carriers and that of the excess carriers differs, we conclude that the excess carriers had no duty to defend the Ledbetter, Speiginer, Vladimiroff, Zangwill or Bryant claims for the same reasons that we concluded that the primary carriers had no duty to defend. The policies did not provide coverage for intentionally inflicted injuries. The definition of "occurrence" specifically excludes such injuries. *See Solo Cup Co. v. Federal Ins. Co., supra.*

■ The final assignment of error is that the trial court erred in holding the excess carriers jointly and severally liable for the attorney fees awarded to the district pursuant to ORS 743.114, because no money judgment was entered against Stonewall or ICSP in favor of the district. Because

---

[16] It does not appear possible that any of the claims will exceed the policy limits of the primary carriers.

[17] Stonewall agreed to participate in the Speiginer defense under a reservation of rights.

the excess carriers were not liable on any of the claims made against the district, an award of attorney fees against Stonewall and ICSP was improper.

That portion of the judgment declaring that Northwestern Pacific Indemnity Co. had or has a duty to defend or to pay the Ledbetter, Speiginer, Vladimiroff, Zangwill and Bryant claims is reversed. The judgment declaring Northwestern's liability to Stonewall Insurance Co. is affirmed. The portion of the judgment declaring that Stonewall Insurance Co. and the Insurance Company of the State of Pennsylvania have or had a duty to defend any of the discrimination claims is reversed, as is that portion of the judgment holding Stonewall Insurance liable for the attorney fees of School District No. 1. The judgment is otherwise affirmed.