MICHIGAN MILLERS MUTUAL INSURANCE COMPANY v
BRONSON PLATING COMPANY

Docket No. 95639. Argued November 4, 1993 (Calendar No. 17).
Decided July 12, 1994. Rehearing denied 447 Mich 1202.

Michigan Millers Mutual Insurance Company brought an action
in the Branch Circuit Court against Bronson Plating Company,
its insured, seeking a declaration that it was not obligated to
defend Bronson Plating with respect to a potentially responsi-
ble party (PRP) letter from the Environmental Protection
Agency informing Bronson of its potential liability for alleged
environmental contamination because no suit had been com-
menced. Bronson counterclaimed, joining its other named in-
surers as counterdefendants and seeking a declaration that the
insurers had a duty both to defend and to indemnify. The court,
Michael H. Cherry, J., ruled that the insurers had no obligation
under the insurance policies to provide a defense in the absence
of a complaint filed in a court. The Court of Appeals, WAHLS,
P.J., and MARILYN J. KELLY, J. (REILLY, J., dissenting), reversed,
holding that a suit had been brought (Docket No. 123554).

In an opinion by Justice MALLETT, joined by Chief Justice
CAVANAGH, and Justices LEVIN and BOYLE, the Supreme Court
*held:*

The term "suit," as used in the insurance policies at issue, is
ambiguous and capable of application to nontraditional legal
actions that are the functional equivalent of a suit brought in a
court of law. Under this definition, the PRP letter received by
Bronson Plating constituted the initiation of a suit that the
insurers were obliged to defend under the terms of their
insurance policies.

1. An insurance policy must be enforced in accordance with
its terms. A court may not read ambiguities into a policy where
none exist. Although the term "suit" was not defined within
the policies at issue, that alone is not conclusive evidence of
ambiguity. Rather, where no definition is provided, the court
must interpret the term according to its commonly used mean-
ing, taking into account the reasonable expectations of the
parties. Where ambiguity is found, the term must be construed
in the manner most favorable to the insured.

2. In determining what a typical layperson would understand

a particular term to mean, it is customary to consult lay dictionaries. In such publications, the more general definitions of "suit" persuasively suggest the term to apply to proceedings other than a court action initiated by a complaint. Where insurers fail to provide otherwise, that commonly understood meaning must prevail. A broader definition of the term reflects more accurately the modern realities of the legal system. Thus, "suit," as used in the policies at issue, is ambiguous and capable of application to legal proceedings initiated in other than a traditional court setting.

3. In this case, taking into account the various components of the PRP letter and its ramifications, the legal proceeding initiated by receipt of that notice is the functional equivalent of a suit brought in a court of law. Of critical importance is the creation of the administrative record and the role it may play in future litigation. Documentation sought by the EPA that Bronson Plating must produce under the force of law will determine the amount and type of waste generated and discharged onto the site. Given the strict liability stance of the Comprehensive Environmental Response, Compensation, and Liability Act, this information is all that is needed to establish both the fact and proportional share of Bronson's liability at the site. Because the EPA may implement any investigatory and remedial action it deems necessary at the site, subject only to an abuse of discretion review, the total cost of the project will also be determined before litigation is brought. The significant authority given to the EPA in such matters allows it essentially to usurp the traditional role of a court in determining and apportioning liability and may be viewed as coercing the voluntary participation of PRPs.

Affirmed.

Justice GRIFFIN, joined by Justices BRICKLEY and RILEY, dissenting, stated that the word "suit" in the context presented unambiguously refers to court proceedings instigated by the filing of a complaint.

The duty of an insurer to defend its insured may be broader than the insurer's obligation to indemnify. Nevertheless, the duty to defend is contractual, and, if there is no contract to defend, there is no duty to defend. Any delineation of the scope of the duty to defend requires reference to the terms of the insurance contract itself. Where the language of an insurance contract is plain and unambiguous, it must be enforced as written.

The mere assertion of a doubtful meaning in a contract does not give rise to an ambiguity, and a court is not at liberty to

create ambiguity where none exists. Whether terms in an insurance policy are ambiguous is a question for the court, which must examine the words in the contract in which they are used. In common usage, the word "suit" refers to a proceeding in court. That meaning is starkly apparent in the context of the policy language at issue, which draws a clear distinction between "claim" and "suit": the insurer has no obligation to defend against a claim; rather, its duty to defend a suit is engendered by the filing of a complaint, even though the allegations may be groundless, false, or fraudulent. Applying ordinary, common-sense meaning to the policy language, an EPA PRP letter is a claim made, not a suit brought. It is not reasonable for the insured in this case to expect that the contract will be enforced other than according to its terms.

Whether a broader definition of "suit" would more accurately reflect the modern realities of the legal system is irrelevant. The Court must determine the meaning of the term at the time the contract was executed. The majority's holding contravenes settled principles of Michigan insurance law, rewriting unambiguous contract language under the guise of interpretation and ignoring the significance of a complaint in determining the scope of an insured's duty to defend.

197 Mich App 482; 496 NW2d 373 (1992) affirmed.

*Willingham & Coté, P.C.* (by *John A. Yeager* and *Anthony S. Kogut*), for the plaintiff.

*Hickey & Cianciolo, P.C.* (by *Steven M. Hickey* and *Mary Lou K. Posa*), for Commercial Union Insurance Company.

*Bigler, Berry, Johnston, Sztykiel & Hunt, P.C.* (by *Steven C. Berry*), for Hamilton Mutual Insurance Company.

*Sullivan, Ward, Bone, Tyler & Asher, P.C.* (by *Michelle A. Thomas* and *Thomas M. Slavin*), for Indiana Lumbermens Mutual Insurance Company.

*Kitch, Saurbier, Drutchas, Wagner & Kenney, P.C.* (by *Mark D. Willmarth, Susan H. Zitterman,* and *Arthur F. Brandt*), for Indiana Insurance Company.

*Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C.* (by *Kim V. Marrkand*), for Liberty Mutual Insurance Company.

*Law Offices of Beresh & Prokoff* (by *Sandra A. Prokoff*) for Liberty Mutual Insurance Company.

*Miller, Canfield, Paddock & Stone* (by *Michael B. Ortega, James D. Robb,* and *W. Mack Faison*) for Federal Insurance Company.

*Morrison, Morrison & Finley* (by *Kenneth W. Morrison*) for Great Southwest Fire Insurance Company.

*Cummings, McClorey, Davis & Acho, P.C.* (by *Marcia L. Howe* and *T. Joseph Seward*), for the Hartford Accident and Indemnity Company.

*Howard & Howard Attorneys, P.C.* (by *Myra L. Willis*), for Auto-Owners Insurance Company.

*Honigman, Miller, Schwartz & Cohn* (by *Jay E. Brant, Philip A. Grashoff, Jr., Mark A. Goldsmith,* and *Daniel G. Helton*), for the defendant.

Amici Curiae:

*Provizer, Lichtenstein & Phillips, P.C.* (by *Marilyn A. Madorsky*); *Wiley, Rein & Fielding,* of counsel (by *Laura A. Foggan, James M. Johnstone,* and *William A. McGrath*), for Insurance Environmental Litigation Association.

*Covington & Burling* (by *Gregg H. Levy, Eric C. Bosset, Seth A. Tucker,* and *Ronald J. Krotoszynski, Jr.*), and *Warner, Norcross & Judd* (by *Paul T. Sorensen*) for American Petroleum Institute, American Fiber Manufacturers Association, Chem-

ical Manufacturers Association, and Olin Corporation.

*Butzel, Long* (by *John H. Dudley, Jr.,* and *Jack D. Shumate*) for Hi-Mill Manufacturing Company and Petroleum Specialties, Inc.

MALLETT, J. Defendants appeal the Court of Appeals determination that defendants' duty to defend was triggered by plaintiff Bronson Plating Company's receipt of a letter from the United States Environmental Protection Agency, informing Bronson of its potential liability at the contaminated North Bronson Industrial Area site. Defendants argue that receipt of the notice did not give rise to a duty to defend because the letter did not signal the initiation of a "suit" within the meaning of the subject insurance policies.

We find that the term "suit," as used in the insurance policies at issue, is ambiguous and capable of application to legal actions, other than court proceedings, that are the functional equivalent of a suit brought in a court of law. We further hold that the notice of potential liability received by Bronson in this instance, signaled the initiation of a legal proceeding that was the functional equivalent of a traditional court action, and thereby triggered the insurers' duty to defend. We affirm.

I

The pertinent facts of this declaratory judgment action are not in dispute. Since the 1940s, the Bronson Plating Company has engaged in the electroplating of various metal parts at its facility at the North Bronson Industrial Area in Bronson, Michigan. In its electroplating process, Bronson

has utilized a variety of chemicals and compounds, including nickel, nickel-chrome, lead, caustic soda, sulfuric acid, and hydrochloric acid. The process involved the release of large quantities of waste water, and this waste was identified by the EPA and the Michigan Department of Natural Resources as a possible source of environmental contamination of the North Bronson Industrial Area.

Bronson had purchased comprehensive general liability insurance from Michigan Millers Mutual Insurance Company, and three of its policies were in effect consecutively from January 1970 through January 1977. Each of these policies provided that the insurance company shall have the "duty to defend any *suit* against the insured seeking damages on account of . . . bodily injury or property damage"[1] (emphasis added). In addition to its insurance contracts with Michigan Millers, Bronson was insured under several primary and umbrella/excess policies issued by other insurance compa-

---

[1] Each of the policies contained the following provision:

I. COVERAGE A—BODILY INJURY LIABILITY
  COVERAGE B—PROPERTY DAMAGE LIABILITY

The Company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of

A. bodily injury or
B. property damage

to which this insurance applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements.

nies,[2] each of which contained similar language with respect to the insurer's duty to defend.

In April 1986, the EPA, acting under the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA),[3] notified Bronson by letter that it may be liable for contamination of the North Bronson Industrial Area (the "site"). This communication, frequently referred to as a "potentially responsible party" (PRP) letter, advised Bronson that the EPA had "documented the release . . . of hazardous substances . . . at the . . . site, and is planning to spend public funds to control and investigate these releases." In its PRP letter, the EPA, inter alia, requested Bronson's voluntary participation in connection with certain studies, and cautioned that Bronson's failure to do so could result in it being held jointly and severally liable for any costs that were expended. Pursuant to its letter, the EPA also demanded that Bronson supply relevant information, it encouraged good-faith negotiations between Bronson and the agency and with other potentially responsible parties, and it explained that failure to comply "may result in a civil enforcement action being brought against you by EPA."

Although the PRP letter to Bronson was not issued until April 1986, Bronson began notifying its insurers in November 1985 that the EPA considered it to be a possible source of groundwater

[2] The other insurers, which were joined in this action as counterdefendants, are: Federal Insurance Company, one of the Chubb Group of Insurance Companies, Auto-Owners Insurance Company, Commercial Union Insurance Company, Great Southwest Fire Insurance Company (now known as VanLiner Insurance Company), Hartford Accident & Indemnity Company, Indiana Insurance Company, Indiana Lumbermens Mutual Insurance Company, Liberty Mutual Insurance Company, and Hamilton Mutual Insurance Company. Except where otherwise indicated, we refer collectively to Michigan Millers and the counterdefendant insurance companies as the "insurers."

[3] 42 USC 9601 et seq.

contamination at the site.[4] Bronson's letter to Michigan Millers was dated March 21, 1986, and demanded

> pursuant to the terms of any applicable policies of insurance issued by you, . . . that you undertake your responsibility to defend, indemnify and hold Bronson Plating harmless from and against any and all damages . . . or any liability . . . arising out of the listing of the North Bronson Industrial Area on the NPL by [the] EPA . . . .

While the other insurers declined to do so, Michigan Millers agreed to provide a defense for Bronson, subject, however, to a reservation of its rights. Michigan Millers then commenced the instant declaratory judgment action, seeking a judicial determination, inter alia, that it was not obligated to defend Bronson because no "suit" had been commenced. Bronson filed a counterclaim and joined the other named insurance companies as counterdefendants. In its countercomplaint, Bronson sought a declaration that its insurers had a duty both to defend and indemnify Bronson.

The trial court then considered cross-motions for summary disposition and, addressing only the duty to defend issue, ruled that the insurers had no obligation under the insurance policies to provide a defense "in the absence of a complaint filed in a Court against Bronson by the EPA or the DNR."

Thereafter, a divided panel of the Court of Ap-

---

[4] In October 1984, the EPA had proposed that the site be placed on the National Priorities List (NPL), under § 105 of CERCLA, and the listing became final in June 1986. The NPL is a prioritization of contaminated sites compiled and updated annually by the EPA. 42 USC 9605(a)(8)(B). A contaminated site must be included on the NPL if the EPA intends to use public CERCLA funds (the superfund) to finance remedial action in connection with the site. 40 CFR 300.425. The North Bronson Industrial Area was also placed on the Priority List of Contaminated Sites by the DNR pursuant to the Michigan Environmental Response Act, 1982 PA 307, as amended. MCL 299.601 et seq.; MSA 13.32(1) et seq.

peals reversed.[5] The panel majority registered its agreement with the reasoning and result in *Polkow v Citizens Ins Co of America,* 180 Mich App 651; 447 NW2d 853 (1989), rev'd on other grounds 438 Mich 174; 476 NW2d 382 (1991),[6] and declared: "[W]e hold in this case . . . that a 'suit' has been brought." 197 Mich App 482, 491; 496 NW2d 373 (1992).

We then granted leave to appeal, limited to the question whether the EPA letter notifying Bronson of its potential liability for alleged environmental contamination constitutes a "suit" that gives rise to the insurers' duty to defend under the terms of the applicable insurance contracts.[7] 443 Mich 880 (1993).

II

Defendants argue that the PRP letter received by Bronson did not constitute the initiation of a

---

[5] Judge REILLY dissented, stating that she would "adopt the reasoning of *City of Evart v Home Ins Co,* unpublished opinion per curiam of the Court of Appeals, decided April 10, 1989 (Docket No. 103621), and *Ray Industries, Inc v Liberty Mutual Ins Co,* 974 F2d 754 (CA 6, 1992), and affirm the trial court's order granting summary disposition." 197 Mich App 482, 496; 496 NW2d 373 (1992).

[6] The panel majority quoted with approval this sentence from the *Polkow* opinion:

In our view, subjecting the insured to administrative mechanisms mandating an environmental investigation and cleanup, backed by the power to expose the insured to a money judgment in a court of law, amounts to a "suit" for the purposes of invoking the coverage of the policy. [180 Mich App 657.]

[7] The issue whether costs incurred by an insured in response to a letter from an environmental regulatory agency are "damages on account of . . . property damage" has been the subject of extensive litigation. See, e.g., *United States Aviex Co v Travelers Ins Co,* 125 Mich App 579; 336 NW2d 838 (1983). See, generally, Cordes, *Who gets the bill? Determining insurers' duty to defend and indemnify against hazardous waste clean-up costs under general liability policies,* 18 Envtl L 931 (1988). In light of the limitations imposed by the grant order, we do not address that issue.

"suit," triggering their duty to defend. To resolve defendants' claim, we must first determine whether "suit," as used in the subject insurance policies, is an ambiguous term admitting of more than one construction, i.e., whether the term may refer to some legal action other than a court proceeding initiated by a complaint. Second, if the term is ambiguous and capable of broader definition, whether it may reasonably be understood to encompass the PRP letter received by Bronson.

A

When interpreting insurance policies under Michigan law, we are guided by a number of well-established principles of construction. Foremost among those is the maxim that an insurance policy must be enforced in accordance with its terms. *Upjohn Co v New Hampshire Ins Co,* 438 Mich 197, 207; 476 NW2d 392 (1991). A court may not read ambiguities into a policy where none exist. *Auto-Owners Ins Co v Churchman,* 440 Mich 560, 567; 489 NW2d 431 (1992).

Although the term "suit" was not defined within the relevant insurance policies, that fact, alone, is not conclusive evidence that ambiguity exists. *Group Ins Co of Michigan v Czopek,* 440 Mich 590, 596; 489 NW2d 444 (1992). Rather, where no definition is provided, the court must interpret the term according to its "commonly used meaning," *id.,* taking into account the reasonable expectations of the parties. *Vanguard Ins Co v Clarke,* 438 Mich 463, 472; 475 NW2d 48 (1991). Where ambiguity is found, the court must construe the term in the manner most favorable to the insured. *Auto Club Ins Ass'n v DeLaGarza,* 433 Mich 208, 214; 444 NW2d 803 (1989).

There is a division of opinion, both within Michi-

gan and among other jurisdictions, regarding the definition of the term "suit," and its application to nontraditional legal proceedings.[8] Some courts have found that "suit" must refer unambiguously to a court proceeding initiated by a complaint, while others hold that the term may also encompass some nonjudicial proceedings.

In determining what a typical layperson would understand a particular term to mean, it is customary to turn to dictionary definitions. Having, canvassed a number of lay dictionaries, we note that most definitions of "suit" do include a reference to some type of court proceeding, e.g., "the act, the process, or an instance of suing in a court of law." *The Random House Dictionary of the English Language* (1987). Nevertheless, "suit" is not defined *exclusively* in those terms. For instance, *Webster's New World Dictionary of the American Language* (2d college ed, 1982), provides the alternative definition, "attempt to recover a right or claim through legal action," while *Webster's Third New International Dictionary of the English Language* (1964), defines suit as "the attempt to gain an end by legal process: prosecution of a right before any tribunal."

The existence of these alternative and more general definitions of a "suit" persuasively suggests that a typical layperson might reasonably

---

[8] Some courts have found this division of authority to be, itself, conclusive evidence that ambiguity exists. See, generally, anno: *Division of opinion among judges on same court or among other courts or jurisdictions considering same question, as evidence that particular clause of insurance policy is ambiguous,* 4 ALR4th 1253. We do not adopt that view. Nevertheless, we do find the division of authority to be instructive and to at least lend credence to the position that more than one reasonable interpretation of the term exists. *C & J Commercial Driveway, Inc v Fidelity & Guaranty Fire Corp,* 258 Mich 624, 629; 242 NW 789 (1932) (A split of authority demonstrates "at least that [the term] is of doubtful meaning and requires construction").

expect the term to apply to legal proceedings other than a court action initiated by a complaint. *Morrisville Water & Light Dep't v United States Fidelity & Guaranty Co,* 775 F Supp 718, 731-732 (D Vt, 1991). Where the insurers fail to provide otherwise, that commonly understood meaning must prevail.

Furthermore, defendants' suggestion that this Court has previously limited application of the term "suit" to court proceedings is unconvincing. The only Michigan Supreme Court case law interpreting the term in the context of triggering an insurer's duty to defend is inconclusive with regard to the case before us.

In *Patterson v Standard Accident Ins Co,* 178 Mich 288; 144 NW 491 (1913), this Court addressed the question whether a criminal prosecution constitutes a "suit" against which an insurer is obliged to defend. In its opinion, the *Patterson* Court explored the definition of "suit," observing as follows:

> It must be conceded that the word "suit," as applied to legal controversies, both by the legal profession and others, is now used and recognized as a generic term of broad significance, often understood and used, even by legislatures and courts, to designate *almost any proceeding in a court,* even, though rarely, being applied to a criminal prosecution in certain connections. [*Id.* at 292. Emphasis added.]

Despite this observation, focusing on the use of the term with regard to court actions, when the Court proceeded to set forth a definition of "suit," it did so more broadly, stating:

> "Suit," in its general unqualified use in legal

documents, such as the one before us, naturally means, and should be construed as intended to include, *the mode or manner authorized and adopted by law to redress civil injuries.* [*Id.* Emphasis added.]

On this basis, the *Patterson* Court determined that criminal prosecutions were not covered.

The *Patterson* discussion fails to definitively endorse or reject the application of the term "suit" to nonjudicial proceedings. However, by defining "suit" broadly as the "mode or manner authorized and adopted by law to redress civil injuries," the Court certainly left open the possibility that proceedings occurring outside the courtroom could be encompassed. Accordingly, defendants' reliance upon *Patterson* is misplaced.[9]

We also note that a broader definition of the term "suit" reflects more accurately the modern realities of our legal system. As the legal community and state and federal legislatures struggle to relieve the ever-increasing burdens on our courts and the constantly rising costs of litigation, a gravitation is evident toward less formal and more expeditious means of dispute resolution. This movement has manifested itself in the growing use of arbitration, as well as increased authority given to administrative agencies to resolve disputes, so

---

[9] We disagree with the dissent's suggestion that *Patterson* must be read to *implicitly* limit application of the term to traditional court proceedings. *Post* at 595-596 ("while resolving the issue of the *type* of court proceedings contemplated by the term 'suit' in the particular contract, the *Patterson* Court necessarily found that the commencement of court proceedings is indispensable to the existence of a 'suit'"). A finding that "suit" refers exclusively to court proceedings was not indicated by the Court's reasoning in that case. Because only judicial proceedings were at issue, application of the term to nonjudicial proceedings was neither necessary nor relevant to the Court's discussion. Therefore, the Court's failure to discuss the term in the context of nonjudicial proceedings should not be read to suggest that an implicit limitation was intended.

that the functional equivalents of suits brought in a court of law have developed.[10] As is discussed in more detail below, this point is particularly valid in the context of CERCLA actions, where the Legislature has deliberately and painstakingly developed a system in which a PRP has every incentive to "voluntarily" cooperate with the EPA, before actual litigation,[11] and where significant legal prejudice may develop if the PRP fails to do so.[12]

Therefore, we find the term "suit" as used in the insurance policies at issue, to be ambiguous and capable of application to legal proceedings initiated in other than a traditional court setting.

## B

Having determined that the term "suit" is capable of application to nonjudicial legal proceedings, we must next determine whether the PRP letter received by Bronson did, in fact, constitute the initiation of a suit under the subject insurance

[10] Even outside the environmental arena, courts have defined the term "suit" broadly and found it to encompass arbitration, *Madawick Contracting Co v Travelers Ins Co,* 307 NY 111, 117-119; 120 NE2d 520 (1954), and administrative proceedings. *Solo Cup Co v Federal Ins Co,* 619 F2d 1178, 1188, n 7 (CA 7, 1980), cert den 449 US 1033 (1980); *Campbell Soup Co v Liberty Mutual Ins Co,* 239 NJ Super 488, 496-499; 571 A2d 1013 (1988), aff'd 239 NJ Super 403; 571 A2d 969 (1990); *School Dist No 1, Multnomah Co v Mission Ins Co,* 58 Or App 692, 703-704; 650 P2d 929 (1982); *Community Unit School Dist No 5 v County Mutual Ins Co,* 95 Ill App 3d 272, 278-279; 50 Ill Dec 808; 419 NE2d 1257 (1981).

[11] There is no question that PRPs, as well as the government, could benefit from less litigation in this area. The transaction costs related to ameliorating a CERCLA site can be staggering. In a recently published study, the experiences of 108 PRPs at eighteen superfund sites were examined. It was concluded that those PRPs spent an average of $1.24 million on site-related costs between 1981 and 1991. Of that amount, some twenty-one percent, or $260,000 per PRP was spent on transaction costs, primarily legal fees. Dixon, Drezner & Hammitt, Private-sector cleanup expenditures and transaction costs at 18 superfund sites (RAND, 1993).

[12] See, generally, note, *The best equitable defense is a good offense,* 29 Nat Resources J 849 (1989).

policies. Once again, the jurisdictions are split on this issue.

Some courts have found that a typical PRP letter from the EPA constitutes the initiation of a suit, thereby giving rise to the duty to defend. Those courts have emphasized the particular nature of CERCLA-related actions, and the unique authority given to the EPA to develop an essentially binding record and to design and implement actions that the PRPs may later be held liable for. See, e.g., *Coakley v Maine Bonding & Casualty Co,* 136 NH 402, 416-419; 618 A2d 777 (1992); *Hazen Paper Co v United States Fidelity & Guaranty Co,* 407 Mass 689, 696-699; 555 NE2d 576 (1990).

In contrast, other jurisdictions have declined to impose a duty to defend absent a more definitive and directive EPA action, e.g., an order to undertake site investigation or cleanup. Those courts have tended to focus on the "voluntary" participation sought by the EPA, as well as the lack of certainty that litigation would ensue if the PRP failed to comply. See, e.g., *Ryan v Royal Ins Co of America,* 916 F2d 731, 741 (CA 1, 1990); *Avondale Industries, Inc v Travelers Indemnity Co,* 887 F2d 1200, 1206 (CA 2, 1989), cert den 496 US 906 (1990).

In determining whether a "suit" was initiated in the present case, we must examine the contents of the PRP letter received by Bronson. In pertinent part, that letter informed Bronson that the EPA had identified it as a potentially responsible party for contamination at the North Bronson Industrial Area. Barring an immediate offer from any of the PRPs to conduct a remedial investigation and feasibility study (RI/FS), the EPA would undertake to complete one. If the EPA did so, under the terms of

42 USC 9607(a), Bronson could be held jointly and severally liable for "all costs associated with the removal or remedial action and all other necessary costs incurred in cleaning up the site, including investigation, planning and enforcement." Further, the EPA required Bronson to submit documentation regarding any waste it had released onto the site. Failure to comply with this demand could result in civil action and fines.

Taking into account the various components of this PRP letter and its ramifications, we find that the legal proceeding initiated by the receipt of that notice is the functional equivalent of a suit brought in a court of law.[13] Of critical importance is the creation of the administrative record and the role it may play in future litigation. Documen-

---

[13] In making this determination, we are cognizant of the concern raised by the insurers that a decision in plaintiff's favor might blur the distinction between "claim" and "suit" evidenced in their insurance policies. While the policies reserve for the insurer the *right* to investigate any *"claim,"* the insurers' *duty to defend* extends only to a *"suit."* In response to this concern, we wish to emphasize that this opinion should in no way be viewed as intimating that every request for relief should be considered the initiation of a suit that the insurers are obliged to defend. Rather, our determination on this issue is made primarily based on the unique aspects of CERCLA actions and the authority given to EPA under the statute. As explained by the Ninth Circuit Court of Appeals in *Aetna Casualty & Surety Co, Inc v Pintlar Corp,* 948 F2d 1507, 1516-1517 (CA 9, 1991):

Unlike the garden variety demand letter, which only exposes one to a potential threat of future litigation, a PRP notice carries with it immediate and severe implications. Generally, a party asserting a claim can do nothing between the occurrence of the tort and the filing of the complaint that can adversely affect the insureds' rights. However, in a CERCLA case, the PRP's substantive rights and ultimate liability are affected from the start of the administrative process. *Avondale Industries, Inc v Travelers Indem Co,* 697 F Supp 1314, 1321 (SD NY, 1988) ("Adverse consequences can befall an insured during the administrative pollution cleanup process"), aff'd 887 F2d 1200 (CA 2, 1989).

Accordingly, we do not disturb the basic claim/suit distinction contained within the subject insurance policies.

tation sought by the EPA, and which Bronson must produce under the force of law, will determine the amount and type of waste generated by Bronson and discharged onto the site. Given the strict liability stance of CERCLA, this information is all that is needed to establish both the fact and proportional share of Bronson's liability at the site.[14]

Moreover, because the EPA may implement any investigatory and remedial action it deems necessary at the site, subject only to an abuse of discretion review,[15] the total cost of the project will also be determined before litigation is brought. The significant authority given to the EPA in such matters allows it essentially to usurp the traditional role of a court of law in determining and apportioning liability. Such matters are concluded *by the* EPA before the action is ever brought to court.[16]

The EPA's powers may also be viewed as coercing the "voluntary" participation of PRPs. The entire CERCLA scheme revolves around "encouraging" PRPs to engage in voluntary cleanups. Only in so doing may a PRP have a voice in developing the record that will be used against it and in determining the amount of its liability through selection of investigatory and remedial methods and procedures. The significance of these incentives is underscored by the fact that EPA-conducted CERCLA

[14] 42 USC 9607(a). Defenses to CERCLA liability are virtually nonexistent. 42 USC 9607(b).

[15] 42 USC 9613(j)(2) provides that the government's selection of a response action will be upheld "unless the objecting party can demonstrate, on the administrative record, that the decision was arbitrary and capricious or otherwise not in accordance with law."

[16] See, e.g., *Coakley, supra* at 418 ("One would not expect a traditional tort defendant to concede the 'damages' portion of a case, and it likewise would be myopic to conclude that the Coakleys' rights are not substantially determined by the administrative process described in the PRP notice"), citing *Hazen Paper Co, supra* at 695-697.

actions have historically been considerably and, some would suggest, needlessly more expensive than those actions conducted by PRP groups.[17]

Finally, we note, from a policy perspective, that the position urged by defendants would only increase the litigiousness of this already extensively litigated area of the law. Limiting an insurer's duty to defend to an actual court proceeding preceded by a complaint would merely encourage PRPs to decline "voluntary" involvement in site cleanups, waiting instead for an actual lawsuit to be brought in order to receive insurance coverage. This would have the effect of substantially protracting the cleanup of contaminated sites.

### III

We find that the term "suit," as used in the insurance policies at issue, is ambiguous and capable of application to nontraditional legal actions that are the functional equivalent of a suit brought in a court of law. We further hold that, under this definition, the PRP letter received by Bronson constituted the initiation of a "suit" that the insurers were obliged to defend under the terms of their insurance policies.

We affirm.

CAVANAGH, C.J., and LEVIN and BOYLE, JJ., concurred with MALLETT, J.

---

[17] Anderson, *Negotiation and informal agency action: The case of superfund,* 1985 Duke L J 261, 302 (1985) ("EPA assessment and cleanup costs might average thirty to forty percent more than equivalent private cleanups"); Babich, *Understanding the new era in environmental law,* 41 SC L R 733, 760, n 118 (1990) (" '[T]he government may spend from 100 percent to 500 percent more than a private client would spend to accomplish essentially the same site study or cleanup' "), quoting Lee, *EPA response action: Contracting and cost recovery under CERCLA,* 4 Toxics L Rep 216, 219, n 41 (1989).

GRIFFIN, J. (*dissenting*). In its opinion today, the majority holds that a "suit," against which the insurer must defend its policyholder under the insurance contract in question, is commenced upon mere issuance by the United States Environmental Protection Agency of a letter informing the policyholder of its potential liability for alleged environmental contamination.[1] I respectfully dissent. Because the word "suit," as used in the contract, unambiguously refers to court proceedings instigated by the filing of a complaint, I would reverse the decision of the Court of Appeals.

I

Our approach to the task presented should be guided by certain fundamental tenets of construction that have particular application in the field of insurance law. It is generally recognized that the duty of an insurer to defend its insured may be broader than the insurer's obligation to indemnify. *Allstate Ins Co v Freeman,* 432 Mich 656, 662; 443 NW2d 734 (1989) (RILEY, J.). Nevertheless, the "duty to defend is contractual and if there is no contract to defend there is no duty to defend." 14 Couch, Insurance, 2d (rev ed), § 51:35, p 444. Any delineation of the scope of the duty to defend requires reference to the terms of the insurance contract itself. *Freeman, supra* at 701 (BOYLE, J.); *Stockdale v Jamison,* 416 Mich 217, 224; 330 NW2d 389 (1982); *Arco Industries Corp v Travelers Ins Co,* 730 F Supp 59, 66 (WD Mich, 1989).

It is well settled that ambiguities in the meaning of the terms of an insurance contract are to be resolved in favor of the insured. *Mays v Ins Co of*

---

[1] The full text of the letter from the EPA to Bronson is set forth in an addendum.

*North America,* 407 Mich 165, 172; 284 NW2d 256 (1979); *Wozniak v John Hancock Mutual Life Ins Co,* 288 Mich 612, 615; 286 NW 99 (1939).[2] However, this notion is tempered by the axioms that "[m]eaning should be given to all terms" and "[a]mbiguities should not be forced." *Fresard v Michigan Millers Mutual Ins Co,* 414 Mich 686, 694; 327 NW2d 286 (1982).[3] When the language of an insurance contract is plain and unambiguous, it must be enforced as written. *Eghotz v Creech,* 365 Mich 527, 530; 113 NW2d 815 (1962); *Kingsley v American Central Life Ins Co,* 259 Mich 53, 55; 242 NW 836 (1932).

Although the issue presented is one of first impression in this Court, it has been addressed with mixed results by other courts applying Michigan law. In *City of Evart v Home Ins Co,* unpublished opinion per curiam of the Court of Appeals, decided April 10, 1989 (Docket No. 103621), the panel found that the term "suit," as used in such a

---

[2] To determine whether an ambiguity exists, this Court has stated:

> If a fair reading of the entire contract of insurance leads one to understand that there is coverage under particular circumstances and another fair reading of it leads one to understand there is no coverage under the same circumstances the contract is ambiguous and should be construed against its drafter and in favor of coverage.
>
> Yet if a contract, however inartfully worded or clumsily arranged, fairly admits of but one interpretation it may not be said to be ambiguous or, indeed, fatally unclear. [*Raska v Farm Bureau Mutual Ins Co,* 412 Mich 355, 362; 314 NW2d 440 (1982).]

[3] "Contracts . . . are to be construed according to the sense and meaning of the terms which the parties have used, and if they are clear and unambiguous, their terms are to be taken and understood in their plain, ordinary, and popular sense." [*Farm Bureau Mutual Ins Co v Stark,* 437 Mich 175, 181; 468 NW2d 498 (1991), quoting *Kingsley v American Central Life Ins Co,* 259 Mich 53, 55; 242 NW 836 (1932).]

policy, was "clear and unambiguous, and [that], given its plain and ordinary meaning," it did not encompass a policyholder's receipt of a notice letter issued by the DNR.

Drawing upon the *Evart* ruling, a similar result was reached in several decisions by federal courts applying Michigan law that determined the meaning of "suit" in the context of an insured's receipt of a PRP letter. See *Upjohn Co v Aetna Casualty & Surety Co,* 768 F Supp 1186, 1198 (WD Mich, 1990) ("[T]he PRP letter issued to an insured is not a 'suit' within the meaning of the general liability insurance policies . . . in accord with *City of Evart*"); *Arco Industries Corp v Travelers Ins Co,* supra at 68 ("[T]he PRP letter issued to [the insured] is not a 'suit' within the meaning of the insurance policies and . . . it did not trigger the insurers' duty to defend [the insured] against the EPA").[4]

Notwithstanding the holding in *Evart* and its progeny, a subsequent panel of the Michigan Court of Appeals issued a contrary decision in *Polkow v Citizens Ins Co of America,* 180 Mich App 651; 447 NW2d 853 (1989), rev'd on other grounds 438 Mich 174; 476 NW2d 382 (1991).[5] It concluded that for the DNR to subject an insured to its "administra-

[4] See also *Harter Corp v Home Indemnity Co,* 713 F Supp 231, 233 (WD Mich, 1989) ("The Court finds that a 'suit' in this context plainly means some type of court proceeding").

[5] The *Polkow* panel relied upon *United States Aviex Co v Travelers Ins Co,* 125 Mich App 579; 336 NW2d 838 (1983). However, as explained by Judge Enslen in *Arco, supra,*

The *Aviex* court did not hold that the DNR's notification letter triggered the insurer's duty to defend. Rather, it held that a justiciable controversy existed, before the DNR filed suit, over whether the insured would be obligated to defend and indemnify the insured *if the DNR later filed suit.* [*Id.* at 68. Emphasis added.]

tive mechanisms" mandating environmental investigation and cleanup, "backed by the power to expose the insured to a money judgment in a court of law, *amounts to a 'suit'* for purposes of invoking the coverage of the policy." 180 Mich App 657 (emphasis added).[6]

More recently, the United States Court of Appeals for the Sixth Circuit rejected the *Polkow* reasoning, and adopted the position reflected in *Evart, Upjohn,* and *Arco,* i.e., that receipt by an insured of a PRP letter from the EPA does not constitute a "suit" within the meaning of such policy language. *Ray Industries, Inc v Liberty Mutual Ins Co,* 974 F2d 754, 764 (CA 6, 1992).

As noted by the majority, the decisions of courts in other jurisdictions are also divided on this issue. A number of courts have held, consistent with *Ray Industries,* that use of the term "suit" in this context contemplates the commencement of court proceedings.[7] Other courts have looked to the extent and nature of administrative activity to deter-

---

[6] Similarly, in a decision on which the *Polkow* panel relied, an insured's receipt of a PRP letter was found to be a "suit" in *Fireman's Fund Ins Cos v Ex-Cell-O Corp,* 662 F Supp 71 (ED Mich, 1987) (applying Michigan law). See also *Higgins Industries, Inc v Fireman's Fund Ins Co,* 730 F Supp 774, 776 (ED Mich, 1989) (where the insured received a notice letter from the DNR, the court held, under Michigan law, "that insurance companies must defend governmental claims and demands in the environmental context, irrespective of whether those claims are couched in demand letters, administrative procedures, or in formal suits, until it is factually established that the policies do not apply").

[7] Courts which have held that the term "suit" in comprehensive general liability policies contemplates court proceedings include: *City of Edgerton v General Casualty Co of Wisconsin,* 184 Wis 2d 750, 781; 517 NW2d 463 (1994) (the Wisconsin Supreme Court found that a " '[s]uit' denotes court proceedings, not a 'functional equivalent' "); *Harleysville Mutual Ins Co, Inc v Sussex Co,* 831 F Supp 1111 (D Del, 1993) (applying Delaware law, the term suit unambiguously does not include the issuance of a PRP letter), *Patrons Oxford Mutual Ins Co v Marois,* 573 A2d 16 (Me, 1990) (an administrative order compelling cleanup by responsible parties was not a suit seeking damages under Maine law), *A Johnson & Co, Inc v Aetna Casualty & Surety Co,* 741

mine whether and when the functional equivalent of a suit has been reached, and have concluded that the mere issuance by an agency of a PRP-type letter does not constitute a suit.[8] However, in line with *Polkow* and the view urged upon us by Bronson, still other courts have ruled that a suit is commenced when a PRP letter is issued by the EPA.[9]

---

F Supp 298 (D Mass, 1990), aff'd on other grounds 933 F2d 66 (CA 1, 1991) (applying Maine law, the filing of a civil complaint for injunctive relief arising out of hazardous waste cleanup is not a suit), and *Becker Metals Corp v Transportation Ins Co*, 802 F Supp 235 (ED Mo, 1992) (applying Missouri law, an EPA compliance order under CERCLA is not a suit). In an unpublished opinion, a federal district court applying Colorado law also recognized that a suit requires the existence of court proceedings. *Metro Wastewater Reclamation District v Continental Casualty Co*, unpublished memorandum opinion of the United States District Court for the District of Colorado, decided September 23, 1993 (Docket No. 89-C-895).

[8] Jurisdictions that have adopted this hybrid approach, in which mere receipt of a PRP letter is insufficient, include: Ohio, *Professional Rental, Inc v Shelby Ins Co*, 75 Ohio App 3d 365, 376; 599 NE2d 423 (1991) (holding "that a 'suit' is commenced . . . at the moment the EPA issues an administrative order which the PRP is legally obligated to obey, or otherwise attempts to enforce liability through an injunctive action or cost recovery action filed in a court of law"), New York, *Ryan v Royal Ins Co of America*, 916 F2d 731, 741-742 (CA 1, 1990) (under New York law, a suit is determined by the "coerciveness, adversariness, [and] the seriousness of the effort with which the government hounds an insured, and the gravity of imminent consequences," that does not include a state environmental agency's "implied invitation to voluntary action"), *Avondale Industries, Inc v Travelers Indemnity Co*, 887 F2d 1200 (CA 2, 1989), cert den 496 US 906 (1990), *Borg-Warner Corp v Ins Co of North America*, 174 AD2d 24; 577 NYS2d 953 (1992) (adopting *Ryan* and *Avondale* analysis, a suit did not include administrative proceedings that sought only voluntary participation and negotiation and did not threaten litigation), North Carolina, *CD Spangler Construction Co v Industrial Crankshaft & Engineering Co, Inc*, 326 NC 133; 388 SE2d 557 (1990) (state agency compliance orders mandating remedial action constitute a suit), and Wisconsin, *City of Edgerton v General Casualty Co of Wisconsin*, 172 Wis 2d 518; 493 NW2d 768 (1992), rev gtd sub nom *Edgerton Sand & Gravel v General Casualty*, 497 NW2d 130 (1993) (adopting the analysis of *Ryan, supra*).

[9] Jurisdictions finding the existence of a "suit" upon the issuance of a PRP letter include: Illinois, *United States Fidelity & Guaranty Co v Specialty Coatings Co*, 180 Ill App 3d 378; 535 NE2d 1071 (1989), Iowa, *A Y McDonald Industries, Inc v Ins Co of North America*, 475 NW2d 607 (Iowa, 1991) (an EPA administrative compliance action

Today, a majority of this Court adopts the third of these three approaches. I dissent because the insurance policy language delineates the risk assumed and makes clear that the parties contracted for a defense by the insurer against a lawsuit brought in court, and not for something else that might be regarded by some as the "functional equivalent" thereof.

II

A

The majority finds the term "suit" in the policies before us "to be ambiguous and capable of application to legal proceedings initiated in other than a traditional court setting." *Ante* at 571. I disagree. The mere assertion of doubtful meaning does not give rise to an ambiguity, and a court is not at liberty to create ambiguity in a contract where none exists. *Upjohn Co v Hampshire Ins Co,* 438 Mich 197, 206; 476 NW2d 392 (1991). Whether terms in a policy are ambiguous is a question for the court, which must examine the words in the context in which they are used. *Jones v Farm Bureau Mutual Ins Co,* 172 Mich App 24, 27-28; 431 NW2d 242 (1988).

Here, the language in question reads:

> The Company shall have the right and *duty to defend any suit* against the insured seeking dam-

culminating in a consent order is a suit), Massachusetts, *Hazen Paper Co v United States Fidelity & Guaranty Co,* 407 Mass 689; 555 NE2d 576 (1990), and New Hampshire, *Coakley v Maine Bonding & Casualty Co,* 136 NH 402; 618 A2d 777 (1992). See also *Aetna Casualty & Surety Co, Inc v Pintlar Corp,* 948 F2d 1507 (CA 9, 1991) (applying Idaho law), *Village of Morrisville Water & Light Dep't v United States Fidelity & Guaranty Co,* 775 F Supp 718 (D Vt, 1991) (applying Vermont law), and *Time Oil Co v Cigna Property & Casualty Ins Co,* 743 F Supp 1400 (WD Wash, 1990) (applying Washington law).

ages on account of such bodily injury or property damage, even if any of the allegations of the *suit* are groundless, false or fraudulent, and may make such investigation and settlement of any *claim* or *suit* as it deems expedient, but the Company shall not be obligated to pay any *claim* or *judgment* or to defend any *suit* after the applicable limit of the Company's liability has been exhausted . . . . [Emphasis added.]

In common usage, the word "suit" refers to a proceeding in court, and that meaning is starkly apparent in the context of this policy language, which draws a clear distinction between a "claim" and a "suit." Significantly, no obligation is imposed upon the insurer to defend against a *claim*. However, if a *suit* is brought against the insured, the duty of the insurer to defend is engendered even though the allegations in the complaint may be "groundless, false or fraudulent."

This distinction between a "claim" and a "suit" does not appear in just one place; it is recognized generally in the contract. For example, at another point the policy language instructs:

4. Insured's Duties in the Event of Occurrence, *Claim* or *Suit:*

\* \* \*

(b) If *claim is made* or *suit is brought* against the insured, the insured shall immediately forward to the [insurer] every demand, notice, summons or other process received by him or his representative. [Emphasis added.]

Giving the policy language its ordinary, common-sense meaning, I believe it is apparent that

the EPA's issuance of a PRP letter is a "claim made," and not a "suit brought."[10]

The majority's holding that a PRP letter constitutes a "suit" renders superfluous the language giving the insurer the right to investigate and settle any *claim,* contrary to the tenet that a court must "give effect to all words in an insurance contract if they serve a reasonable purpose." *Allstate Ins Co v Freeman, supra* at 688. Surely, the authority to investigate and settle a *claim,* distinct from a *suit,* undeniably serves a reasonable purpose.

In effect, the majority has imprudently accepted Bronson's argument that we either should ignore altogether the long-recognized distinction between a claim and a suit, see 14 Couch, Insurance, 2d (rev ed), § 51:43, p 457, or that somehow we should say that a very serious claim is a suit. Such an argument amounts to a request that we rewrite the contract between the parties, which we cannot

---

[10] Another example of the distinct parameters of a "suit" in this context can be found by reference to the "Supplementary Payments" section found in the policies at issue, wherein the insurer agrees to pay

> (a) . . . all costs taxed against the insured in *any suit* defended by the company and all interest *on the entire amount of any judgment therein* which accrues after *entry of the judgment* and before the company has paid or tendered or deposited *in court that part of the judgment* which does not exceed the limit of the company's liability thereon:
> (b) premiums *on appeal bonds required in any such suit,* . . . . [Emphasis added.]

Read together, these policy provisions indicate that the parties contemplated a "suit" to include the entry of a judgment, payable into court if adverse to the insured, resulting in a possible appeal. I believe that such a "suit" can only mean one thing: a formal proceeding in a court of law. See also *Ray Industries, supra* at 762 (referring to identical policy language, the court noted that "the policies obviously assume that a 'suit' involves courts, judgments, and possible appeals").

do under the guise of interpretation. *Upjohn Co,* *supra* at 207. As the *Ray* court observed, "while [the insurer] has the power to investigate any claim, it contracted to defend only suits." *Id.* at 762.

Even without resort to the dictionary, the meaning of the word "suit," in the context of its use in this policy language, is clear and unambiguous. However, this conclusion is strongly fortified by reference to the definitions that are available in the modern lay dictionaries. For example, see:

> *Random House, Webster's College Dictionary* (1991) ("[A]n act or instance of suing in a *court* of law; lawsuit; a petition or appeal"); *Webster's Third New International Dictionary* (1966) ("[A]n action or process in a *court* for the recovery of a right or claim"); *Webster's New World Dictionary of the American Language* (college ed, 1968) ("[A]n action to secure justice in a *court* of law; attempt to recover a right or claim through legal action"); *Webster's II—New Riverside University Dictionary* (1984) ("A *court* proceeding to recover a right or claim"); *Funk & Wagnall's Standard College Dictionary* (1968) ("A proceeding in a *court* of law or chancery in which a plaintiff demands the recovery of a right or the redress of a wrong"); *The American Heritage Dictionary of the English Language* (3d ed) ("[C]ourt proceeding to recover a right or claim"); *Scott Foresman, Advanced Dictionary* (Doubleday ed, 1979) ("[C]ase in a *court* of law; application to a court for justice"); and *The Random House College Dictionary* (1975) ("[T]he act, the process, or an instance of suing in a *court* of law; legal prosecution; lawsuit").

These definitions are echoed in Black's Law Dictionary (6th ed), which explains that a "suit" is

> A generic term, of comprehensive signification, referring to any proceeding by one person or persons against another or others *in a court of law* in which the plaintiff pursues, *in such court,* the remedy which the law affords him for the redress of an injury or the enforcement of a right, whether at law or in equity. [Emphasis added.]

The majority has managed to find several dictionary definitions referring to suit as an "attempt to recover a right or claim through legal action" or an "attempt to gain an end by legal process" (*ante* at 568), and asserts that these "persuasively suggest" ambiguity in the meaning of the term. However, I see no ambiguity in such variations. Rather, I agree with Judge Boggs who, writing for the United States Court of Appeals for the Sixth Circuit, stated:

> [A] "suit," as that term is used both in conversation and in dictionaries, is an attempt to gain an object *in the courts*[,] . . . as opposed to demands and other tactics that, however powerful, are not enforced by a court of law. We reject any attempt to allow phrases that appear in the definitions of "suit," such as "legal process," to expand this term beyond its traditional meaning to include a plethora of quasi-judicial actions from administrative orders to bureaucratic regulations. [*Ray Industries, supra* at 761. Emphasis in original.]

Pointing to an increase in the use of arbitration and other alternative dispute resolution mechanisms, the majority seeks to justify its result by asserting that "a broader definition of the term

'suit' reflects more accurately the modern realities of our legal system." *Ante* at 570. But such an assertion is irrelevant. Our task is to determine the meaning of language used by the parties at the time a contract was executed. Of course, for a higher premium, the parties might have agreed that the insurer would defend the policyholder, not only against suits brought in court but also in arbitration or other out-of-court dispute resolution activities. But that is not the contract of the parties in this case.[11] Instead of giving effect to the language of the insurance policy before us, the majority looks beyond the contract to embark on a hazardous course of rewriting private contracts for the apparent purpose of furthering social policies as they arise.

The most recent rejection of the majority's analysis by the highest court of a sister state was registered by the Supreme Court of Wisconsin. In *City of Edgerton v General Casualty Co of Wisconsin,* 184 Wis 2d 750; 517 NW2d 463 (1994), that court ruled that an insurer did not have a duty to defend against a PRP letter by the EPA or a comparable notification letter by a state agency because a "suit" had not been commenced. Finding "no ambiguity in the term 'suit,' " *id.,* p 781, the court rejected

[11] The language at issue, i.e., the duty to defend a "suit," was developed in comprehensive general liability policies long before 1980, the effective date of CERCLA's enactment. See, generally, Salisbury, *Pollution liability insurance coverage, the standard-form pollution exclusion, and the insurance industry: A case study in collective amnesia,* 21 Envtl L 357, 363-364 (1991); note, *Triggering the liability insurer's duty to defend in environmental proceedings: Does potentially responsible party notification constitute a "suit"?* 67 St John's L R 383, 384, n 3 (1993). Thus, it would have been impossible for the parties to have contemplated the type of responsibility that a PRP letter now commands. Nevertheless, the majority concludes that the type of liability involved here is within the definition of the term "suit," as contemplated by the parties on the date of contracting, with the aid of hindsight.

the argument that such notification letters are the
" 'functional equivalent of a suit' ":

> Construing either the EPA's PRP letter or the DNR
> letters as the "functional equivalent of a suit"
> would be contrary to present Wisconsin insurance
> law since (a) the insurer would have to look be-
> yond the four corners of the complaint in order to
> assess whether a potentially covered claim exists,
> and (b) the insurer would be put in the position of
> anticipating a coverage expectation for which it
> did not contract or receive payment. [*Id.,* p 781.]

Likewise, the majority's holding today contra-
venes settled principles of Michigan insurance law.
It not only rewrites unambiguous contract lan-
guage under the guise of interpretation, but it
ignores the significance of a complaint in deter-
mining the scope of an insurer's duty to defend. As
this Court recently reiterated in *Protective Nat'l
Ins Co of Omaha v City of Woodhaven,* 438 Mich
154, 159; 476 NW2d 374 (1991):

> "*The duty of the insurer to defend the insured
> depends upon the allegations in the complaint* of
> the third party in his or her action against the
> insured. This duty is not limited to meritorious
> suits and may even extend to actions which are
> groundless, false, or fraudulent, so long as the
> allegations against the insured even *arguably*
> come within the policy coverage. . . . In a case of
> doubt as to whether or not the complaint against
> the insured alleges a liability of the insurer under
> the policy, the doubt must be resolved in the
> insured's favor. 14 Couch, Insurance, 2d (rev ed),
> § 51:45, p 538 [now § 51:49, p 489]." [Quoting *De-
> troit Edison Co v Michigan Mutual Ins Co,* 102

Mich App 136, 141-142; 301 NW2d 832 (1980). Emphasis added.][12]

Thus, the proper construction of the word "suit," rejected today by the majority, comports with the well-established judicial practice of delineating the scope of the duty to defend by analyzing the complaint, which necessarily contemplates the filing of a lawsuit.

It is at least noteworthy, I suggest, that the plain, common-sense meaning that attaches today to the word "suit" has deep roots in the American jurisprudence. In 1821, Chief Justice Marshall considered the meaning of this word, which appears in the Eleventh Amendment to the United States Constitution.[13] Writing for the United States Supreme Court in the seminal decision *Cohens v Virginia,* 19 US (6 Wheat) 264, 407-408; 5 L Ed 257 (1821), he stated:

> What is a suit? We understand it to be the prosecution, or pursuit, of some claim, demand, or request. In law language, *it is the prosecution of some demand in a Court of justice. . . .*
> *To commence a suit, is to demand something by the institution of process in a Court of justice; and to prosecute the suit, is, according to the common acceptance of language, to continue that demand.* By a suit commenced by an individual against a State, we should understand process sued out by that individual against the State, *for the purpose*

---

[12] See also *Iowa Kemper Ins Co v Ryan,* 172 Mich App 134, 137; 431 NW2d 434 (1988), and *Frankenmuth Mutual Ins Co v Beyer,* 153 Mich App 118, 122; 395 NW2d 36 (1986).

[13] The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State. [US Const, Am XI.]

*of establishing some claim against it by the judg-
ment of a Court;* and the prosecution of that suit is
its continuance. [Emphasis added.]

To be sure, much has changed since 1821. How-
ever, despite the evolution and empowerment of
administrative agencies, such as the EPA and the
DNR, the traditionally understood meaning of
"suit" has not been altered.

B

In this appeal, Bronson argues that an expan-
sive interpretation of the term "suit" is justified
because this Court "has long recognized that cover-
age under an insurance policy must be determined
on the basis of the reasonable expectations of the
insured," citing *Zurich Ins Co v Rombough,* 384
Mich 228; 180 NW2d 775 (1970).[14] This "reasonable
expectations" argument is completely without
merit as applied to the contract language here at
issue.[15]

In *Rombough,* our Court quoted with approval
from an opinion by Justice Tobriner, of the Cali-
fornia Supreme Court, who wrote in *Gray v Zurich
Ins Co,* 65 Cal 2d 263, 269-270; 54 Cal Rptr 104;
419 P2d 168 (1966):

In interpreting an insurance policy we apply the
general principle that doubts as to meaning must
be resolved against the insurer and that any ex-
ception to the performance of the basic underlying

[14] Bronson also cited *Crowell v Federal Life & Casualty Co,* 397
Mich 614, 623; 247 NW2d 503 (1976), in which this Court interpreted
the term "confining sickness" in a health insurance policy, and opined
that a "technical construction . . . which would defeat a reasonable
expectation of coverage is not favored."

[15] It is recognized that the majority chose not to rely on this
argument.

obligation must be so stated as to clearly apprise the insured of its effect.

\* \* \*

Although courts have long followed the basic precept that they would look to the words of the contract to find the meaning which the parties expected from them, they have also applied the doctrine of the adhesion contract to insurance policies, holding that in view of the disparate bargaining status of the parties we must ascertain the meaning of the contract which the insured would reasonably expect.

In *Rombough,* however, this Court left no doubt that it found ambiguity in the terms of the policy under review:

The relationship between the exclusion clause (b) and § II(a) of the policy results in some uncertainty as to the insurer's duties. . . . It is elemental insurance law that ambiguous policy provisions must be construed against the insurance company and most favorably to the premium-paying insured. [*Id.* at 232.]

The policy of insurance involved in this case is sufficiently ambiguous to require [a] defense . . . by [the insurance company]. [*Id.* at 234.]

While Bronson may be correct in asserting that this Court has "recognized" the reasonable expectations theory of insurance contract interpretation, it must be said, at least, that the scope and application of the concept has been the source of considerable controversy. In *State Farm Mutual Automobile Ins Co v Ruuska,* 412 Mich 321; 314 NW2d 184 (1982), the Court considered the meaning of a policy exclusion relating to "non-owned automobiles." Justice WILLIAMS, joined by Justices FITZGERALD and MOODY, opined that the clause was

repugnant to the no-fault act and therefore void. Justice LEVIN disagreed with that reasoning, but concurred in the result on the ground that the exclusion was "unconscionable and contrary to the reasonable expectations of an insured . . . ." *Id.* at 343.

As Justice LEVIN explained, the policy at one point stated that it covered the insured when she drove a "non-owned" automobile. However, in another section of the policy the term was defined to exclude an automobile owned by a relative residing in the same household and made available to the insured on a regular basis. Justice LEVIN observed that there "is no evidence that [the insured] knew of the exclusion. . . . [I]t was not even contained in the list of exclusions but, rather, was embedded in the definition of a term which the average consumer would probably consider clear on its face . . . ." *Id.* at 349.

Chief Justice COLEMAN, joined by Justices KAVANAGH and RYAN, registered disagreement with the result and the reasoning of those holding the policy provision invalid. Finding it "presumptuous to guess what the reasonable expectations of [the insured] may have been," she stated that she was not persuaded by the "reasonable expectations" argument, and added:

> Although the exclusionary language was not ambiguous, the Court [of Appeals] said that it was not set forth obviously enough and so was unenforceable. The reasoning seems to be that because some people do not read the contracts they sign, even if exclusions are explained, the contracts are, in effect, void as to some parts but not as to others. [*Id.* at 353.]

The division within the Court concerning the

reasonable expectations notion was further empha-
sized by release on the same day of the decision in
*Raska v Farm Bureau Mutual Ins Co,* 412 Mich
355; 314 NW2d 440 (1982). Not only are the names
of the two cases similar, but the issue, again,
involved the validity of an "owned vehicle" exclu-
sion in an automobile insurance policy. However,
because the accident giving rise to the suit oc-
curred before the no-fault act, compatibility with
that legislation was not a question. In *Raska,*
Justice WILLIAMS again wrote for those who would
invalidate the exclusion; however, this time his
reasoning was based on the reasonable expecta-
tions of the insured.

Referring to the particular language in question
as "a jigsaw-puzzle statement of coverage," Justice
WILLIAMS explained,

> [C]overage is first announced as absolutely un-
> limited. There is no suggestion whatsoever of any
> limitation. On the other hand, if one turns to the
> back side of the page, it is true that there is a
> section entitled "Exclusions" and by a jigsaw-
> puzzle search and construction back and forth be-
> tween the pages, a series of contradictory limita-
> tions can be affixed to the previously unlimited
> coverage. [*Id.* at 374-375.]

Concluding that a reasonable expectation of cov-
erage should not be defeated by the "obscurant
drafting" of the policy, Justice WILLIAMS indicated
that he would remand for an evidentiary hearing
to determine whether the insured reasonably ex-
pected coverage without the exclusion. *Id.* at 376.
Although he was joined by Justices LEVIN and
MOODY, his opinion was a dissent.

A majority of the *Raska* Court, speaking
through Justice KAVANAGH, decided that the con-

tract should be enforced as written. Joined by Chief Justice COLEMAN and Justices FITZGERALD and RYAN, Justice KAVANAGH stated that "[t]he only pertinent question . . . is whether the exclusionary clause in this contract is ambiguous . . . ." "[I]f a contract, however inartfully worded or clumsily arranged, fairly admits of but one interpretation it may not be said to be ambiguous or, indeed, fatally unclear." He then added,

> Plaintiffs also assert that as drafted the policy did not meet their "reasonable expectations." Still the expectation that a contract will be enforceable other than according to its terms surely may not be said to be reasonable. [*Id.* at 362.]

More recently, in *Powers v DAIIE,* 427 Mich 602; 398 NW2d 411 (1986), this Court consolidated and considered five cases, each of which challenged the validity of an "owned vehicle" exclusion in policies of no-fault insurance. Chief Justice WILLIAMS, once again, wrote an opinion for invalidation. Again, he exhaustively reviewed the history and rationale of the reasonable expectation theory, and concluded that "in these cases, the policyholder, upon reading the contract language is led to a reasonable expectation of coverage." *Id.* at 632. While it happened that a majority of the justices agreed with the result in *Powers,* once again, there was no majority support for the reasonable expectations rationale that, in part, undergirded the decision.[16]

---

[16] Justice ARCHER joined Chief Justice WILLIAMS. Justices BRICKLEY and CAVANAGH concurred in the result only. Concurring in part and dissenting in part, Justice LEVIN wrote separately and expanded his views regarding the reasonable expectations rule as set forth in *Ruuska.* Justice RILEY dissented for the reasons set forth by Chief Justice COLEMAN in her opinion in *Ruuska,* and Justice BOYLE concurred with Justice RILEY.

Even if this Court had taken a different course and had embraced the reasonable expectations theory, such a turn would not support the result reached today by the majority.[17] As Justice LEVIN and Chief Justice WILLIAMS indicated in their writings, the rule primarily addresses concerns stemming from artful definitions, hidden exclusions, and structural arrangements in a contract drafted by the insurer that tend to obfuscate rather than clarify or enlighten the insured. There is nothing of that character or dimension to be found in the provision before us in this case. It is not an exclusion or exception to coverage. The language at issue is "up front" in the policy; there is no separate definition in another section of the contract; the terms are common, ordinary words, and they have been used in insurance contracts with the same meaning for many years.

I conclude, as did the *Raska* Court, that it is not reasonable for the insured in this case to expect that the contract will be enforced other than according to its terms.

C

Bronson also argues that as early as 1913 this Court recognized that a "suit" is not limited to an action in a court of law. In *Patterson v Standard Accident Ins Co,* 178 Mich 288; 144 NW 491 (1913), we were asked to determine the meaning of the word "suit" as that term was used in an automobile insurance policy. Bronson notes that in *Patterson* the Court referred to a suit as "the mode or

---

[17] See *Vanguard Ins Co v Clarke,* 438 Mich 463, 472; 475 NW2d 48 (1991), in which the Court took note of the "rule of reasonable expectations" as described by Justice WILLIAMS in *Powers, supra* (" '[a]n adjunct to the rules of construction' ") and found that it had been satisfied from an objective standpoint.

manner authorized and adopted by law to redress
civil injuries." *Id.* at 292. As Bronson sees it, an
EPA administrative proceeding under CERCLA com-
menced by a PRP letter fits that definition. Embrac-
ing Bronson's view of *Patterson,* the majority sug-
gests that "by defining 'suit' broadly . . . the
Court certainly left open the possibility that pro-
ceedings occurring outside the courtroom could be
encompassed." *Ante* at 570. I disagree.

The issue in *Patterson* was whether a "suit,"
against which the insurer was obligated to defend,
included a criminal prosecution or pertained only
to civil actions for damages. Finding the word
"suits" to mean "*civil* suits which would determine
the pecuniary liability of defendant for injury to
person or property," *id.* at 293 (emphasis added),
this Court observed:

> It must be conceded that the word "suit," as
> applied to legal controversies, both by the legal
> profession and others, is now used and recognized
> as a generic term of broad significance, often un-
> derstood and used, even by legislatures and courts,
> *to designate almost any proceeding in a court,*
> even, though rarely, being applied to a criminal
> prosecution in certain connections.
>
>    *   *   *
>
> [T]he expression "criminal suit" is unnatural
> and awkward to the professional ear and is seldom
> used, even in common parlance. "Suit," in its
> general unqualified use in legal documents, such
> as the one before us, naturally means, and should
> be construed as intended to include, the mode or
> manner authorized and adopted by law to redress
> *civil* injuries. [*Id.* at 291-292. Emphasis added.]

It is evident from the above-quoted passage that,
while resolving the issue of the *type* of court
proceedings contemplated by the term "suit" in

the particular contract, the *Patterson* Court necessarily found that the commencement of court proceedings is indispensable to the existence of a "suit." Thus, rather than contradicting previous case law, as Bronson suggests, the conclusion that a PRP letter does not constitute a suit is consistent with and supported by the reasoning set forth in *Patterson* more than eighty years ago.

III

Although, as the Maine Supreme Court has observed, "our role here is simply to determine the meaning of a private contract between these parties, not to foster or retard environmental goals," *Patrons Oxford Mutual Ins Co v Marois,* 573 A2d 16, 17 (Me, 1990), I am not oblivious to the consequences that may flow from an EPA notice letter. In view of the extraordinary authority vested in the EPA through enactment by Congress of CERCLA, and the financial burdens that can befall a target of its scrutiny, anyone who receives such a letter would be foolish not to take it seriously. Still, that is not sufficient reason for a court to create new coverage and impose risks not assumed or paid for by the contracting parties.[18]

For the reasons stated, I conclude that the term "suit" in the context presented unambiguously refers to court proceedings instigated by the filing

[18] The majority suggests that "from a policy perspective, . . . the position urged by defendants would only increase the litigiousness of this already extensively litigated area of the law." *Ante* at 575. I disagree. My position, and that advocated by defendants, would affirm a bright-line rule that, by clearly delineating the scope of risk, reduces the need for future litigation. Indeed, it is the position taken by the majority that will open the flood gates of litigation by inviting, and requiring, a case-by-case determination whether each new and different letter presenting the claim of an administrative agency is to be deemed the "functional equivalent of a suit brought in a court of law." *Ante* at 575.

of a complaint. Accordingly, I would reverse the decision of the Court of Appeals.

BRICKLEY and RILEY, JJ., concurred with GRIFFIN, J.

ADDENDUM

UNITED STATES
ENVIRONMENTAL PROTECTION AGENCY
REGION 5
230 SOUTH DEARBORN ST.
CHICAGO, ILLINOIS 60604

REPLY TO THE ATTENTION OF
5HE-12

Certified mail

Return Receipt Requested

Re: North Bronson Industrial Area
     Bronson, Michigan

Dear Sir of [sic] Madam:

The United States Environmental Protection Agency (EPA) has documented the release or threatened release of hazardous substances, pollutants and contaminants at the above-referenced site, and is planning to spend public funds to control and investigate these releases. This action will be taken by EPA pursuant to the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA), 42 U.S.C. § 9601 *et seq.,* unless EPA determines that such action will be done properly by a responsible party. Responsible parties under CERCLA include the current and former owners or operators, and persons who generated the hazardous substances or were involved in transport, treatment, or disposal of them at the site.

Based on data we received during our investigation concerning the hazardous substances at this

site, EPA has information that indicates that you and/or your firm may be a responsible party. Before the government undertakes necessary action at the site, we would like to know if you will voluntarily perform the work required to abate any release or threatened release of hazardous substances, pollutants, and contaminants from the site. You should be aware that under Section 107(a) of CERCLA, where the Agency uses public funds to achieve cleanup of the hazardous substance, you may be liable for all costs associated with the removal or remedial action and all other necessary costs incurred in cleaning up the site, including investigation, planning and enforcement.

EPA is currently planning to conduct the following studies at the above site:

1. Further investigations to identify the local hydrogeological characteristics, and define the nature and extent of soil, air, and surface water contamination at the site, and
2. Feasibility studies to evaluate possible remedial actions to remove or contain hazardous substances, pollutants, and contaminants at the site.

In addition to the above studies, other corrective measures may be necessary to protect public health, welfare or the environment. These correcive [sic] measures may include, but are not necessarily limited to:

1. Implementation of initial remedial measures, e.g., securing the site to prevent contact with any potentially hazardous or toxic materials at the site and/or removal of contaminated material from the surface;
2. Designing and implementing the EPA-approved remedial option for both contaminated groundwater and soil;
3. Providing any monitoring and maintenance necessary after remedial measures have been completed.

EPA will consider an immediate offer from you to conduct the remedial investigations and feasibility studies (RI/FS) described above. You should notify EPA, in writing within 10 calendar days from the receipt of this letter, of your willingness to conduct or participate with other potentially responsible parties in the RI/FS. Otherwise, EPA will assume that you decline any involvement in the RI/FS and will proceed with the appropriate studies and any initial remedial measures needed to secure the site. EPA may later invite you to undertake the design and implementation of the selected remedy upon the Agency's completion of the RI/FS.

Your letter should indicate the appropriate name, address, and telephone number for further contact with you. If you are already involved in discussions with state or local authorities, engaged in voluntary action, or involved in a lawsuit regarding this site, you should continue such activities as you see fit; you should not interpret this letter to advise or direct you to restrict or discontinue any such activities. You should report, however, the status of those discussions or that action in your letter. Please provide a copy of your letter to any other parties involved in those discussions. Also, please indicate if you or your representative plans to attend a meeting between EPA and the potentially responsible parties, to be held in Chicago on June 3, 1986 to discuss this matter and to provide you with more detailed specifications as to the required work.

Your letter should be sent to:

Janet Haff
U.S. EPA - Region V
Waste Management Division
Hazardous Enforcement Branch
CERCLA Enforcement Section
230 South Dearborn Street
Chicago, Illinois 60604

Ms. Haff can also be reached by telephone at (312) 886-6541.

EPA would like to encourage good faith negotiations between you and the Agency and among you and other parties potentially responsible for the site. So that you may schedule meaningful discussions with other potentially responsible parties regarding cleanup efforts, and quickly organize yourselves into a single representative body to facilitate negotiations with the Agency, we are enclosing a list of other potentially responsible parties which have been identified with the above-referenced site.

In addition, EPA is seeking to obtain certain other information from you pursuant to its authority under Section 104 of CERCLA, 42 U.S.C. § 9604, and Section 3007 of the Resource Conservation and Recovery Act (RCRA) as amended, 42 U.S.C. § 6927, for the purpose of enforcing CERCLA and RCRA and for the purpose of assisting in determining the need for response to a release of hazardous substance(s) under CERCLA. The Administrator of the EPA has the authority to require any person who generates, stores, treats, transports, disposes, arranges for the disposal of, or otherwise handles hazardous wastes and hazardous substances, as those terms are defined in Section 1004(5) of RCRA, 42 U.S.C. § 6903(5) and Section 101(14) of CERCLA, 42 U.S.C. 9601(14), to furnish EPA with information related to such activities. Pursuant to these statutory provisions, you are hereby requested to submit the following information (see definitions below):

1. Copies of any and all information in your possession, or otherwise available to you, regarding the corporate relationship and history between you and any users, owners, and/or operators of

the waste disposal lagoons and connecting sewer systems. Such information shall include, but not be limited to, deeds, contracts, subcontracts, leases, subleases, purchase agreements, partnership agreements, indemnification agreements, and any other correspondence that pertains to the above.

2. Copies of any and all information in your possession, or otherwise available to you, regarding your involvement with the construction, ownership, operation, and/or maintenance of the waste disposal lagoons and connecting sewer systems. Such information shall include, but not be limited to, deeds, contracts, subcontracts, leases, subleases, purchase agreements, partnership agreements, maintenance agreements, maps, blueprints or other documents which indicate construction specifications, and any other information or correspondence that pertains to the above.

3. A detailed description of the generic, common and/or trade name, the chemical composition and the character (i.e. liquid, solid, sludge) of the waste materials offered by you for discharge to the waste disposal lagoons and/or directly to County Drain Number 30.

4. For each hazardous substance identified above, please give the total volume, in gallons for liquids and sludges, and in cubic yards for solids, which you discharged or cause to have discharged to the waste disposal lagoons or directly to County Drain Number 30, and list when discharge occurred.

5. Copies of all records, including analytical results and material safety data sheets which indicate the chemical composition, and/or chemical character of the waste materials you discharged or caused to have discharged to the waste disposal lagoons and/or directly to County Drain Number 30.

6. Copies of any and all information that docu-

ments spills, lagoon overflows, connecting sewer line breaks or leaks, release of waste materials to County Drain Number 30, and/or any direct release of waste materials, contaminants or pollutants to the environment via waste disposal activities in and around the waste disposal lagoons.

7. A list and description of any and all liability insurance coverage that is and was carried by you, including but not limited to any self-insurance provisions, which relate to waste materials or hazardous substances and the above-referenced site. Include copies of all such insurance policies.

For purposes of the information requested, the North Bronson Industrial Area site includes two distinct waste disposal lagoon systems. The first set of lagoons, or "old" lagoons, were constructed in about 1939 and are located northwest of the City of Bronson's wastewater treatment plant, south of County Drain Number 30, and west of the Ruggles Street extension in the NE 1/4, Section 11, Township 7 South, Range 8 West. The second set of lagoons, or "new" lagoons, were constructed in 1949 and are located east of Matteson Street approximately 1500 feet east of the "old" lagoons in the NW 1/4, NW 1/4, Section 12, Township 7 South, Range 8 West. The Bronson Plating Company is located directly southeast of the "new" lagoons. These lagoons are collectively referred to as the "waste disposal lagoons." In your reply distinguish between the two waste disposal lagoon systems and provide the necessary documentation to support the above.

County Drain Number 30 is located directly north of both waste disposal lagoon systems. It flows westerly discharging into Swan Creek approximately 1.5 miles downstream from the "old" waste disposal lagoons. The attached map illustrates the approximate locations of the "old" waste

disposal lagoons, the "new" waste disposal lagoons, and County Drain Number 30.

To assist you in answering this request, the information sought pertains to any and all information in your possession, custody or control relating to the operation of the above-referenced site and to the transportation, storage, and/or disposal of hazardous substances or the generation of hazardous substances which were ultimately disposed of or offered for disposal at the site. The relevant time period for this request is from 1935 through the present.

For purpose of this information request, "shipping documents" shall mean all contracts, agreements, purchase orders, requisitions, pick-up or delivery tickets, customs forms, freight bills, shipping memoranda, order forms, weight tickets, work orders, manifests, shipping orders, packing slips, bills of lading[,] invoices, bills and any other similar documents that evidence discrete transactions involving shipment, or the arrangement for shipment, of waste materials to, through, or from, the above-referenced site. "Waste materials" shall mean hazardous substances, solid wastes and hazardous wastes, and other materials which may or may not contain pollutants or contaminants, and shall include reclaimed and off-specification materials of any kind.

The information sought herein must be sent to EPA within thirty (30) calendar days of your receipt of this letter. Under Section 3008 of RCRA, 42 U.S.C. § 6928, failure to comply with this letter may result in an order requiring compliance or in a civil action for appropriate relief. These provisions also provide for civil penalties. Failure to comply with this request under Section 104 CERCLA, 42 U.S.C. § 9604 may result in a civil enforcement action being brought against you by EPA.

The information requested herein must be provided notwithstanding its possible characterization

as confidential information or trade secrets. You may request, however, that any such information be handled as confidential business information. A request for confidential treatment must be made when the information is provided, since any information not so identified will not be accorded this protection by the EPA. Information claimed as confidential will be handled in accordance with the provisions of 40 C.F.R. Part 2.

The written statements submitted pursuant to this request must be notarized and submitted under an authorized signature certifying that all information contained therein is true and accurate to the best of the signatory's knowledge and belief. Moreover, any documents submitted to Region v pursuant to this information request should be certified as true and authentic to the best of the signatory's knowledge and belief. Should the signatory find, at any time after the submittal of the requested information, that any portion of the submitted information is false, the signatory should so notify EPA. If any answer certified as true should be found to be untrue, the signatory can and may be prosecuted pursuant to 18 U.S.C. 1001.

Your reply to the request for information under Section 104 of CERCLA and Section 3007 of RCRA should be considered separate and distinct from that relating to participation in response activities at the site. It should also be sent to the address listed above.

If you need further information regarding our information request, you may contact Mr. Michael Gifford of our Hazardous Waste Enforcement Branch at (312) 886-7257. If you have any legal questions, contact Mr. T. Leverett Nelson, Assistant Regional Counsel at (312) 886-6852.

Due to the nature of the problem at this site and the attendant legal ramifications, EPA strongly encourages you to submit a written response within the time frame specified herein. We hope

that you will give this matter your immediate
attention.

Sincerely yours,


/s/Basil G. Constantelos, Director
Waste Management Division