The DETROIT EDISON COMPANY,
Plaintiff—Appellant,

v.

PROTECTION MUTUAL INSURANCE
CO., Defendant—Appellee.

No. 96–1893.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 27, 1997.

Decided Jan. 21, 1998.

---

Robert A. Marsac (argued and briefed), Daniel F. Berry and James F. Kamp (briefed), Wise & Marsac, Detroit, MI, for Plaintiff–Appellant.

Witold Sztykiel, Bigler, Berry, Johnston, Sztykiel & Hunt, Troy, MI, Nelson Nettles (argued and briefed), Richard L. Norris (briefed), Norris, Choplin & Schroeder, Indianapolis, IN, for Defendant–Appellee.

Before: MARTIN, Chief Judge; KENNEDY and NELSON, Circuit Judges.

## OPINION

DAVID A. NELSON, Circuit Judge.

■ This is an appeal from a summary judgment for an insurance company against which an electric utility asserted property damage insurance claims. The insurance policy contained an "expediting expense" clause covering the "extra costs of temporary repair of damage to property and the extra costs of expediting the permanent repair or replacement of such damaged property...." The question presented is whether the policy obligated the insurance company to pay, as extra costs of temporary "repair," the cost of installing temporary replacements for damaged transformers and cables. The district court answered this question "no," concluding that to replace the damaged property temporarily was not to repair it temporarily. Upon de novo review of the record, we reach the same answer. The summary judgment will be affirmed.

### I

During calendar year 1984, the record discloses, the plaintiff, Detroit Edison Company, maintained property damage insurance coverage under a fire, boiler and machinery policy that was due to expire at the end of the year. Working through independent insurance brokers, Detroit Edison invited competitive bids, or "renewal quotations," on replacement coverage.

Prospective bidders were given specifications that outlined in considerable detail the coverage Detroit Edison wished to purchase.[1] Part I, Section H, of the specifications called for "Expediting Expense" coverage with a "$2,000,000 limit for all perils (Fire, Boiler and Machinery)."

Detroit Edison arranged to have one of the brokerage firms, Johnson & Higgins, obtain a proposal from the defendant, Protection Mutual Insurance Company. Prepared jointly by Johnson & Higgins and Protection Mutual, and submitted under date of November 14, 1984, the proposal described a single five-year policy that would replace Detroit Edison's existing coverages—both primary and excess—under various policies maintained by the utility company on all of its property located on premises owned, leased, or occupied by it.

Among the stated objectives of the proposal was that of providing "a stable, long-term underwriting program featuring broad coverages at a competitive price."[2] The proposal set forth a number of "General Coverage Features," one of which—captioned "Expediting Expense"—was responsive to Part I, Section H, of the specifications. The following language was used to describe the expediting expense feature:

"The reasonable and necessary extra costs of temporary repair and the extra costs of expediting permanent repair or replacement of damaged property resulting from an occurrence insured by the policy is cov-

---

1. The outline was not necessarily set in concrete. The bidding instructions encouraged submission of "separate recommendations for additional changes as respects coverage, deductibles, or any other aspect of the insurance program."

2. The final paragraph of the "Objectives" section of the proposal warned that "[a] gap in coverage can be a financial disaster." Curiously, the sentence immediately preceding this one seemed to

suggest that the protection being offered did not lend itself to quantification: "The amount of premium any company requires to put an insurance program into effect is quantified, but the strength and weaknesses of the policy and the protection it represents are not." The record does not disclose whether this sales pitch was drafted by Protection Mutual or by Johnson & Higgins.

ered under this endorsement and subject to a Limit of $2,000,000."

Detroit Edison accepted the Protection Mutual proposal, and the insurance company issued a binder that took effect on January 1, 1985. Subject to stated limits of liability, the binder provided property damage coverage under designated standard forms—including Property Damage Form 3000 and Repair or Replacement Endorsement 3100—with respect to all of Detroit Edison's property "[a]s per list on file...." The printed form on which the binder was prepared listed "Business Interruption" and "Extra Expense" coverages as options, but did not purport to bind either coverage.[3]

The policy itself, which was transmitted to Johnson & Higgins on February 14, 1985, recited on its first page that subject to specific exclusions, Protection Mutual insured Detroit Edison against "ALL RISKS OF PHYSICAL LOSS OR DAMAGE" to the property described in the policy.[4] The policy contained a schedule of locations listing a number of power plants, including Detroit Edison's Monroe, St. Clair, and River Rouge plants. The schedule indicated that coverage was provided for "Real and Personal Property" at each location.

Part A of the policy form, captioned "PROPERTY INSURED," went on to specify that "this Policy covers the following property while on the described premises and within 1,000 feet thereof:

"1. real property in which the insured has an insurable interest;

"2. personal property owned by the insured; * * *."

Part B, captioned "PROPERTY EXCLUDED," said that the policy did not insure

against loss or damage to "land," among other categories of property.

Part D of the policy form, captioned "ADDITIONAL COVERAGES," contained an "Expediting Expense" section the first paragraph of which read as follows:

"This Policy covers up to a limit of $[2 million per location] the reasonable and necessary extra costs of temporary repair of damage to property and the extra costs of expediting the permanent repair or replacement of such damaged property resulting from physical damage insured against by this Policy."

The policy did not otherwise cover expenses incurred to maintain business operations or to avoid a business interruption loss. Part C of the policy form, captioned "EXCLUSIONS," said that the policy did not insure against loss caused by, among other things, "delay or loss of market."

The claims in question here arose from three different incidents that resulted in damage to property covered by the insurance. The first such incident occurred on October 3, 1988, when there was an internal failure of a transformer at the Monroe power plant. The transformer "tripped off line," and the damage to the transformer was such that a permanent replacement had to be installed. The cost of the permanent replacement exceeded $3 million. Subject to a $500,000 deductible, Protection Mutual paid this cost in full. The insurance company refused, however, to pay for installing (and later removing) a spare transformer that was put into service prior to the installation of the permanent replacement. The temporary replacement costs came to approximately $255,000.

---

3. As the district court was to explain in its opinion, business interruption and extra expense coverages are more "expansive" than expediting expense coverage. Business interruption insurance covers "the loss of earnings due to the loss of either sales or production," and extra expense insurance covers "expenses incurred to maintain business operations beyond normal coverage." Slip opinion dated June 11, 1996, p. 2, n. 1.

 Notwithstanding that the binder listed the more expansive coverages as available options, it appears that Protection Mutual did not in fact offer either type of coverage to utility companies. As far as we know, Detroit Edison did not have business interruption coverage or extra expense coverage under the policies that were in force before Protection Mutual bound the risk.

4. The first page of the policy further recited that Detroit Edison was insured "to the extent of the actual cash value of the property at time of loss, but not exceeding the amount which it would cost to repair or replace the property with material of like kind and quality within a reasonable time after such loss, ... without compensation for loss resulting from interruption of business...."

A similar incident, which occurred at the St. Clair plant on March 6, 1989, also resulted in damage to a transformer. The permanent repair or replacement cost came to approximately $1 million, which sum was paid by Protection Mutual subject to the $500,000 deductible. Here too there was a temporary replacement with a spare transformer, or "loaner," and Protection Mutual refused to pay the installation/removal cost (approximately $135,000) of the temporary replacement.

In a letter sent to Detroit Edison on July 6, 1989, a Protection Mutual affiliate explained that the policy contained "no Business Interruption coverage or coverage for expenses used to avoid a Business Interruption loss." A subsequent letter explicitly rejected Detroit Edison's claim for "costs associated with the loaner transformer." After noting that the policy did not provide business interruption or extra expense coverage, and after quoting the language of the expediting expense provision that was included in the policy, the letter asserted that installation of a temporary transformer constituted neither a "temporary repair" of the damaged transformer nor an "expediting [of] the permanent repair or replacement of such damaged property," within the meaning of these words as used in the expediting expense provision.

The third incident was a fire that damaged underground cables at the River Rouge plant. Protection Mutual paid for the permanent repair or replacement of the damaged cables (a cost approaching $1.5 million, less the deductible), but the insurance company declined to pay for installing and later removing 100,000 feet of cable that Detroit Edison placed above ground in order to permit operations to continue prior to replacement of the underground cable. The disputed costs at River Rouge came to approximately $205,000.

Invoking the court's diversity jurisdiction, Detroit Edison brought suit against Protection Mutual in the United States District Court for the Eastern District of Michigan. Cross motions for summary judgment, supported by numerous exhibits and excerpts from deposition transcripts, were filed in due course. Applying Michigan law, as the parties agreed it was required to do, the district court granted the insurance company's summary judgment motion and denied the utility company's. Detroit Edison has perfected a timely appeal.

## II

Stressing that the Protection Mutual policy provided "all risks" coverage on "all" Detroit Edison property at the specified locations, and emphasizing that the principal form on which the policy was prepared (Form COMP 3000 (5/84)) was a "comprehensive" property insurance form developed to replace boiler/machinery forms on which insured objects had been listed individually, Detroit Edison suggests that the insured "property" consisted of integrated power generating systems as a whole. On the strength of this suggestion, Detroit Edison invites us to hold that the systems themselves were temporarily repaired, within the common meaning of that term, when the damaged transformers and cables were temporarily replaced. The invitation is elegantly phrased, but we believe that it ought to be declined.

The fact that Protection Mutual's Form 3000 is an "all risks" policy has no bearing, as far as we can see, on the question whether the installation of temporary replacements for damaged transformers and damaged cables constituted temporary repair of damage to insured property. The word "risk" is something of a chameleon, of course, but in the present context it merely signifies the peril insured against. See *University of Cincinnati v. Arkwright Mutual Ins. Co.*, 51 F.3d 1277, 1280 (6th Cir.1995), contrasting "all risk" insurance policies with "named peril" insurance policies.

Policies written on Form 3000 provide insurance coverage against physical loss or damage caused by any peril (fire, flood, earthquake, explosion, or whatever) not the subject of a specific policy exclusion. Protection Mutual has always acknowledged that the damage to Detroit Edison's transformers and cables was caused by perils within the ambit of the policy—witness the fact that the insurance company paid millions of dollars

for permanent replacements—and insofar as Detroit Edison's argument is based on the "all risks" feature of the policy, the argument looks to us like a red herring.

We turn next to the suggestion that because the policy covered all of Detroit Edison's real property (other than land) and all of its personal property at the scheduled locations, the "property insured" should be viewed not as discrete items of real and personal property, but as unified operating systems. Under this view, Detroit Edison argues, damage to an individual transformer should be treated not simply as damage to a transformer, but as damage to an entire power plant. The temporary replacement of a damaged transformer is thus said to have constituted a "temporary repair," within the meaning of the expediting expense provision, because the power plant as a whole was being temporarily repaired.

We are not persuaded that the policy will bear the interpretation that Detroit Edison would have us give it. Nothing in either the language of the policy or its history suggests to us that the parties intended to effect such a dramatic expansion of the property insurance coverage in place prior to 1985. When read in its historical context, we think that the policy clearly and unambiguously means what the district court thought it meant.

The coverage for which Detroit Edison solicited "renewal quotations" in 1984 appears to have been provided under a conventional "fire, boiler and machinery" policy. Such policies, according to the deposition testimony of William Linhares, Protection Mutual's chief underwriter, were written on a "specific object" basis. This means that no coverage was provided for any type of property not individually specified in the policy. If the parties intended that coverage be provided for heating equipment, for example, or production equipment, the policy would refer specifically to those categories of equipment.

One of the major changes reflected in Protection Mutual's new comprehensive "Series 3000" property damage policy, as explained in an exhibit obtained in discovery and reproduced at Tab 6 of the brief accompanying Detroit Edison's summary judgment motion, was the "Elimination of Specific Object Definition[s] for Boiler and Machinery Coverage." · Under the new comprehensive policy, coverage would be provided with respect to any of the insured's property not excluded by the terms of the policy. The practical effect of this change, as the exhibit indicates, was an expansion of coverage to include such items as:

"1. EDP Equipment (including Computing Machines)

2. Communications Equipment (Radio & TV Apparatus)

3. Lifting Equipment (Elevators, Hoists & Cranes)

* * * * * *

14. Any other Property technically considered Machinery or Equipment, but not actually transmitting or receiving energy."

Expediting expense coverage, Mr. Linhares testified, was developed at a time when all boiler and machinery policies were written as separate policies on a specific object basis. If such a policy covered production equipment, for example, and a piece of equipment of that type were damaged in a fire or other peril insured against, the policy's expediting expense provision would obligate the insurance policy to pay "additional costs to fly in the new permanent object or the extra cost of temporary repair of the damaged object."

When conventional boiler and machinery policies were replaced by comprehensive all-risk policies, Mr. Linhares explained, many insurers incorporated "expediting expense" language in the new policies. As a result, the testimony indicates, expediting expense coverage was provided for all damaged objects within the ambit of the expanded policies, including objects—electronic data processing equipment, *e.g.*, or communications equipment—that might not have been covered under the older policies. But Mr. Linhares testified without contradiction that the adoption of comprehensive all-risk forms produced no change "in the nature or extent of expediting expense coverage...."

The logic of this unrefuted testimony is that "expediting expense" coverage was not somehow transmogrified into "extra expense" coverage.[5] Against this background, we believe that the district court was correct in concluding, as it did, that Detroit Edison was not insured against loss or damage to its power plant operations as such. What the company was insured against, rather, was "PHYSICAL LOSS OR DAMAGE" to the real and personal property on the described premises. The district court took this to mean that Protection Mutual had an obligation to make good all physical loss or damage to "each individual building, smoke stack, cable, transformer, etc. on the described premises." We agree. Physical loss or damage to a transformer at Detroit Edison's Monroe power plant, for example, cannot properly be equated with loss or damage to the Monroe plant as a unified whole.[6]

We also agree with the district court's conclusion that the temporary replacement of a transformer or cable cannot properly be equated with the "temporary repair" of damage to the transformer or cable. The expediting expense provision, as the court noted, differentiates between "repair" and "replacement" insofar as permanent repairs and replacements are concerned. Accordingly, in the court's words, "[i]f the parties had intended coverage for 'temporary replacement[ ]' of damaged property, it is reasonable to infer that the Policy would have specifically stated the term, as it did in the case of 'permanent replacement.' "

 Although there appears to be no Michigan caselaw directly in point, the district court's approach is consistent with the general legal principles that govern the interpretation of insurance policies in Michigan. Where an insurance policy uses a term that is not defined in the policy, for example, "the court must interpret the term according to its 'commonly used meaning,' taking into account the reasonable expectations of the parties." *Michigan Millers Mut. Ins. Co. v. Bronson Plating Co.*, 519 N.W.2d 864, 868–69, 445 Mich. 558, 567 (1994). It is essential that the court look at the policy as a whole and enforce it in accordance with its terms. *Advance Watch Co., Ltd. v. Kemper Nat'l Ins. Co.*, 99 F.3d 795, 799 (6th Cir.1996). The goal of the courts is to effectuate the intent of the parties, and "[t]he parties' intent is determined by the plain meaning of the policy language." *Meijer, Inc. v. General Star Indemnity Co.*, 826 F.Supp. 241, 244 (W.D.Mich.1993).

We are satisfied that the intent of the contracting parties in the case at bar, as manifested in the language of the contract as a whole, was properly implemented by the district court's decision. The decision is **AFFIRMED.**

---

5. "As the name implies, [an extra expense policy] provides for the payment of any extra expenses incurred by an insured in order to continue the normal conduct of his business during the period of restoration[,] providing that the damage to the insured's property is by a risk insured against." Appleman and Appleman, *Insurance Law and Practice*, § 3121.25. Detroit Edison's solicitation for renewal quotations specified expediting expense coverage, as we have seen, but not extra expense coverage. Protection Mutual clearly did not bind itself to provide extra expense coverage, and Detroit Edison clearly did not purchase such coverage.

6. An amendment to the policy's "Repair or Replace Endorsement" reflects an understanding of the policy consistent with the district court's. Captioned "TRANSFORMER VALUATION CLAUSE," this amendment changed the method of calculating the insurance company's maximum liability for "insured transformers." Although the amendment did not become effective until after the transformers at the Monroe and St. Clair locations were damaged, we have no reason to suppose that the concept of "insured transformers" would ever have been considered inconsistent with the concept of a comprehensive all-risk policy.